**X CORP., Plaintiff,**

v.

**John DOE, Defendant.**

Civ. No. 92-338-A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 25, 1992.

**1300**

MEMORANDUM OPINION

ELLIS, District Judge.

Few problems are as vexing as determining what evidence justifies a lawyer's disclosure of a client's confidential information and documents, which the lawyer believes reflect an ongoing or future crime or fraud. This case presents precisely this

problem. Plaintiff, X Corp. ("X Corp."),[1] brings this suit, in part, to prevent defendant, John Doe ("Doe"), X Corp.'s former in-house counsel, from disclosing X Corp.'s confidential information and documents retained by Doe following his discharge from X Corp. X Corp. also seeks return of the documents. In support of the relief sought, X Corp. cites the attorney-client privilege, the parties' confidentiality agreement, and the lawyer's general duty to preserve a client's confidences. For his part, Doe claims that the documents in issue disclose ongoing civil and criminal frauds perpetrated by X Corp. against the federal government. As such, according to Doe, the documents fall within the public policy crime-fraud exception to the attorney-client privilege and to any general or contractual duty of confidentiality.

The matter is before the Court on X Corp.'s motion for a preliminary injunction. For the reasons stated here, the motion is granted in part and denied in part.

*Facts*

X Corp. hired Doe in March 1989 as a member of its in-house legal staff based in Northern California. Formerly an Associate Deputy Attorney General of the United States and Chief of Staff to the Attorney General, Doe was a member of the bar of the state of Pennsylvania. When he was hired, Doe executed an "Employment, Invention and Confidential Information Agreement" (the "Confidentiality Agreement"), in which he expressly agreed (i) to return to X Corp. all records obtained during, or in connection with, his employment and (ii) to preserve X Corp.'s confidential information. Thereafter, in the course of his employment, Doe regularly received confidential information from X Corp. management and its employees in order to provide legal opinions and advice. During approximately two years with X Corp., Doe apparently excelled; his professional per-

---

1. To prevent identification of the parties and possible disclosure of confidential information, the Court has ordered that this matter proceed under seal, and, accordingly, pseudonyms are used here.

formance was regarded as excellent.[2] Eventually he was promoted to Group Counsel with primary responsibility worldwide for X Corp.'s compliance with numerous government regulations and antitrust laws.

In November 1990, Doe was transferred from X Corp.'s California office to Virginia as X Corp.'s only United States-based lawyer outside California. The parties sharply dispute the reason for the transfer. In X Corp.'s view, the transfer occurred because Doe failed the California bar examination. Doe, on the other hand, asserts that he initiated the transfer to escape California's high cost of living and because he and his wife wanted to live closer to their relatives in Virginia. Doe also contends that X Corp. negotiated with him to retain his services because he was "an important contributor and asset" and because X Corp. wanted to locate a regulatory and antitrust attorney near Washington, D.C. *See* Affidavit of John Doe at 2.

X Corp. terminated Doe's employment effective February 28, 1992, providing him with thirty-one weeks severance pay. The reason for Doe's discharge is as hotly disputed as the reason for the transfer. X Corp. claims Doe was laid-off as part of a company-wide reduction in force involving over 700 employees. Doe counters, however, that he was unlawfully fired in retaliation for actions X Corp. believed he was taking in furtherance of a possible *qui tam* suit.[3] *See* 31 U.S.C. § 3730(h). On leaving X Corp.'s employ, Doe took with him copies of certain documents and files, leaving the originals with X Corp. Doe claims these

documents reveal that X Corp. is defrauding the federal government, in violation of the False Claims Act.[4] 31 U.S.C. §§ 3729–3733. Specifically, Doe makes two allegations of fraud relating to X Corp.'s government contracts operations. First, Doe alleges that X Corp. is violating the New Materials Clause of the Federal Acquisitions Regulations, FAR 52.210–5, by commingling new and used equipment in sales to the government that require new equipment. Second, Doe claims that X Corp. is violating the Price Reduction Clause of the Federal Acquisitions Regulations, FAR 52.-215–22, by failing to report to the government certain discounts provided to commercial customers through a remanufactured equipment program. The documents submitted *in camera* are plainly relevant to these allegations. But without explanatory testimony or evidence, their significance in terms of establishing an ongoing fraudulent scheme is not entirely clear.

By letter dated February 28, 1992, Doe, through counsel, asserted a state law wrongful termination claim against X Corp., provided X Corp. with a draft complaint, and offered to discuss the matter prior to filing the complaint in this Court. The draft complaint contained specific references to, as well as excerpts from, X Corp.'s allegedly confidential documents. Thereafter, on March 5, 1992, X Corp. filed this lawsuit on the public record of this Court, but at that time, neither served Doe nor informed him of the suit's existence. X Corp.'s complaint asserts five causes of action: (i) breach of fiduciary duty by allegedly revealing confidences to his own attorney;[5] (ii) breach of the Confidentiality

---

**2.** The record discloses that Doe received the highest possible performance rating and was considered by at least some X Corp. officials as one of the top members of X Corp.'s in-house legal team.

**3.** This allegation forms the basis of Doe's retaliatory discharge counterclaim. Under § 3730(b)(1), Doe is prohibited from disclosing whether he has filed a *qui tam* action and made the required disclosure of "substantially all material evidence and information" in his possession to the United States Attorney. *See Erickson v. American Institute of Biological Sciences,* 716 F.Supp. 908, 912 (E.D.Va.1989) (purpose of non-

disclosure requirement is to prevent "tipping off" alleged wrongdoers).

**4.** Consistent with *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Court accepted an *in camera* submission of a portion of the contested documents in anticipation of a possible need to review them to determine whether the crime-fraud exception to the attorney-client privilege applies and allows their disclosure.

**5.** The Court dismissed this claim by Order dated July 2, 1992. Simply put, the inability to disclose relevant facts, including X Corp.'s alleged

Agreement; (iii) recovery of the allegedly misappropriated documents and records; (iv) injunctive relief to prevent disclosure of alleged confidential information in his personal claim against X Corp. or for any purpose; and (v) a declaratory judgment that Doe may not disclose the allegedly confidential information. X Corp. claims that filing this action was necessary to prevent disclosure of X Corp.'s confidential information in the event Doe filed his draft complaint on the public record. That circumstance never materialized, as Doe ultimately consented to delay filing his wrongful termination action and then to do so under temporary seal, which he did on April 7, 1992. One week later, X Corp. notified Doe of the existence of this action.

On April 20, 1992, X Corp. moved this Court for a preliminary injunction (i) to maintain Doe's wrongful termination lawsuit, and all pleadings and papers filed therein, under seal until its conclusion;[6] (ii) to prohibit Doe and his lawyer from making any disclosures of X Corp.'s allegedly privileged and confidential information; and (iii) to compel Doe to return all allegedly misappropriated documents. Following oral argument, the Court took the matter under advisement. Doe, by counsel, agreed to refrain from further disclosures of X Corp.'s claimed confidential information until the Court's ruling.[7] On May 4, 1992, Doe filed his counterclaim alleging retaliatory discharge pursuant to 31 U.S.C. § 3730(h) (providing a private cause of action for discharge in retaliation for acts believed to be in furtherance of a *qui tam* suit).

*Analysis*

It is well-settled that irreparable harm and inadequacy of legal remedies form the basis for injunctive relief in the federal courts. *See Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974). A preliminary injunction is appropriate where

> the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, *and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant.*

*Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 193 (4th Cir.1977) (preliminary injunction issued to preserve status quo) (*quoting Sinclair Refining Co. v. Midland Oil Co.,* 55 F.2d 42, 45 (4th Cir.1932)) (emphasis in original). To prevail, the movant must demonstrate that consideration of the following familiar factors justify preliminary injunctive relief:

1. The likelihood of irreparable harm to the movant if the preliminary injunction is denied;

2. The likelihood of irreparable harm to the non-moving party if the preliminary injunction is granted;

3. The likelihood that the movant will succeed on the merits; and

4. The public interest.

*See Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974 (4th Cir. 1992); *Rum Creek Coal Sales, Inc. v. Ca-*

confidential communications, to his own attorney would cripple Doe's ability to defend against X Corp.'s attack on his professional conduct in the matter at bar. *See* Virginia Code of Professional Responsibility DR4-101(C)(4) (1983) (lawyers are permitted to reveal client confidences and secrets where necessarily to establish the reasonableness of fees or to defend against accusations of wrongful conduct). Moreover, precluding Doe from making disclosures to his counsel would prevent him from effectively prosecuting his personal claims against X Corp. both in his state law-based action now on appeal in the Fourth Circuit Court of Appeals and his counterclaim in this case. *See Doe v. A Corp.,* 709 F.2d 1043, 1048–50 (5th Cir.), *reh'g denied,* 717 F.2d 1399 (1983) (former

in-house counsel could prosecute his personal claim for employee benefits against his former employer/client because a lawyer "does not forfeit his rights simply because to prove them he must utilize confidential information").

**6.** This portion of X Corp.'s motion is moot. Doe's state law wrongful termination claim was filed under temporary seal, then dismissed by this Court, and is now on appeal to the Fourth Circuit Court of Appeals.

**7.** At the hearing, the parties represented, by mutual agreement, that the disclosure issue has been substantially narrowed to a dispute over disclosures to agents or representatives of the federal government or its agencies.

*perton,* 926 F.2d 353 (4th Cir.1991).[8] In applying these factors, the Fourth Circuit follows the "balance-of-hardships" test. *See Natural Resources Defense Council,* 954 F.2d at 981; *Blackwelder,* 550 F.2d at 196. Under this test, the Court must first consider (i) the probable irreparable injury to plaintiff in the absence of preliminary injunctive relief and (ii) the likely harm to defendant with preliminary injunctive relief. *See Blackwelder,* 550 F.2d at 196. If the balance of these two factors is decidedly in favor of plaintiff, "it is enough that grave or serious questions [on the merits] are presented; and plaintiff need not show a likelihood of success." *Id.* at 196. *See Natural Resources Defense Council,* 954 F.2d at 981 (reflecting a refined *Blackwelder* formulation requiring that the balance of harms favor the movant "decidedly"). In essence, plaintiff's likelihood of success on the merits, as a factor in the analytical calculus, increases in significance as the probability of irreparable harm to plaintiff diminishes. *See Blackwelder,* 550 F.2d at 195; *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 923 (3rd Cir.1974). And in every case, the public interest must be considered. *See Blackwelder,* 550 F.2d at 196.

■ This circuit differentiates between requests for preliminary injunctive relief that seek merely to maintain the status quo and requests that seek "mandatory" relief that in some fashion disturbs the status quo, especially where that relief would in effect operate to decide the merits of the case in favor of the moving party. *See Wetzel v. Edwards,* 635 F.2d 283 (4th Cir.

1980). Thus, where a party seeks preliminary injunctive relief encompassing both an injunction to maintain the status quo and one for mandatory relief, the two must be reviewed separately. The moving party bears a heavier burden when seeking mandatory relief.[9]

Here, X Corp. seeks mixed injunctive relief. It seeks to preserve the status quo insofar as it seeks to enjoin Doe from divulging allegedly confidential information. But it also seeks mandatory relief insofar as it seeks to compel Doe to return the copies of documents he retained allegedly in violation of the Confidentiality Agreement. *Cf. Tiffany v. Forbes Custom Boats, Inc.,* 959 F.2d 232 (table), No. 91–3001 (4th Cir. Apr. 6, 1992) (text in Westlaw) (preliminary injunction in contract case "was plainly not one to maintain the status quo but one to effect a transfer of possession, thereby giving the plaintiff the fruits of victory before he had established his right to victory"). Thus, the two requests must be considered separately, with X Corp. bearing a heavier burden with respect to its request for mandatory relief.

A. X Corp.'s Request to Enjoin Doe Temporarily from Making Disclosures of its Alleged Confidential Information

■ Under *Blackwelder* and its progeny, analysis properly begins with an assessment of the likelihood of irreparable harm to X Corp. absent the requested injunctive relief. Such an assessment points persuasively, if not conclusively, to the conclusion that it is highly likely that X Corp. will suffer irreparable harm if the injunction is

---

**8.** The district court must make specific findings as to each factor. *See International Longshoremen's Ass'n, Local 1937 v. Norfolk Southern Corp.,* 927 F.2d 900, 903 (6th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 63, 116 L.Ed.2d 38 (1991); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir.1985).

**9.** *See Wetzel,* 635 F.2d at 286 ("The authority of the district court judge to issue a preliminary injunction, especially a mandatory one[,] should be sparingly exercised. Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief."). *See also SCFC ILC, Inc. v. VISA USA, Inc.,* 936 F.2d 1096, 1099 (10th Cir.1991) (injunctions that disturb the status quo, mandatory injunctions, and injunctions that afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits require satisfaction of "an even heavier burden"); *Doe v. New York University,* 666 F.2d 761, 773 (2nd Cir.1981) ("relief changing the status quo is not favored unless the facts and law clearly support the moving party"); *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir.1979) (because mandatory injunction is "particularly disfavored," movant must make a strong showing of entitlement).

not granted. Once confidential attorney-client communications are disclosed, their confidential nature is permanently and irrevocably impaired. Even if X Corp. were ultimately to prevail, its right to prevent disclosures of confidential information might be forever lost absent a preliminary injunction.

In contrast, the Court discerns no irreparable harm to Doe as a consequence of granting a preliminary injunction with respect to disclosures of X Corp.'s allegedly confidential information. Trial on the merits will determine ultimately the extent to which Doe may or may not disclose X Corp.'s claimed confidential information. In the meantime, if Doe has instituted a *qui tam* suit, or if he wishes to do so, such a suit would not be foreclosed; rather, it would only be delayed until the dispute at bar is resolved (which, in this Division, will occur promptly). Doe argues that he may need to disclose portions of X Corp.'s alleged confidential information in connection with his state law-based wrongful termination claim. That matter, however, is currently on appeal, and Doe has no need to make further disclosures of information contained in the documents for that purpose.[10] Nor would an appropriately tailored preliminary injunction impair Doe's ability to litigate his counterclaim in this action. *Cf. Doe v. A Corp.*, 709 F.2d 1043, 1048–50 (5th Cir.), *reh'g denied*, 717 F.2d 1399 (1983) (duty of confidentiality not a barrier to pursuing a personal claim). In light of the absence of harm to Doe, it is pellucidly clear that the "balance-of-hardships" weighs decidedly in X Corp.'s favor. Thus, X Corp. need not show that it will likely succeed on the merits. Rather, X Corp. is entitled to preliminary injunctive relief if the complaint raises "grave or serious questions," *Blackwelder*, 550 F.2d at 196, that is, "questions going to the merits

so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.* at 195 (*quoting Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 743 (2nd Cir.1953)).

■ Without doubt, this litigation presents "grave or serious questions," questions involving difficult and troubling ethical issues arising in the context of attorney-client confidentiality. Few questions are graver or more serious in the practice of law than determining what evidence of crime or fraud justifies a lawyer's disclosure of his client's confidential information. Moreover, allegations of attorney misconduct, or even potential misconduct, engender significant and serious questions of professional conduct critical to the client, to the accused attorney, and to the bar as a whole. *See Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385 (3rd Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). Such allegations, regardless of their veracity, erode the already fragile public confidence in the legal profession and in the administration of justice. And it is undeniable that our legal system cannot function effectively unless the public has confidence in the integrity and competence of the system and its participants. Thus, it is paramount that lawyers understand and abide by settled and accepted norms of professional conduct. But even settled and accepted norms frequently provide inadequate or ambiguous guidance in the face of specific factual circumstances. So it is here.

■ This litigation focuses on two professional standards of attorney confidentiality—(i) the evidentiary attorney-client privilege and (ii) the broader ethical duty of confidentiality—and their application to the specific facts presented.[11] Understanding

---

10. Excluded from X Corp.'s request for injunctive relief are any disclosures made under seal in connection with Doe's wrongful termination claim. Moreover, should the Fourth Circuit reinstate Doe's state law claim during the pendency of this litigation, Doe would have leave to request any necessary relief from this preliminary injunction for purposes of pursing that claim.

11. As a threshold matter, the parties dispute the choice of applicable law. Doe argues that Pennsylvania law applies because Doe was a member of the Pennsylvania bar and it is only his membership in that bar, conferred by Pennsylvania state law, that creates his status as an attorney and hence his capacity to form an attorney-client relationship. Although Doe's argument is not without some appeal, Virginia law has a

the distinction between these two standards is essential to the matter at bar. For that reason, it is worth describing them here in some detail.

■ The first of these standards, the evidentiary attorney-client privilege, is quite familiar, and the principles associated with it are well-settled. This evidentiary privilege applies to disclosures of certain types of confidences communicated between client and attorney during the course of the attorney's representation of the client. To prevent such disclosures, the client, through counsel or otherwise, may invoke the privilege.[12] The purpose of the attorney-client privilege

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). *See also Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980) ("The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."); *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) (the attorney-client privilege encourages full disclosure by clients to their attorneys). Nevertheless, because it "impedes [the] full and free discovery of the truth," and is "in derogation of the public's 'right to every man's evidence,'" the attorney-client privilege is not "favored" by federal courts. *In re Grand Jury Proceedings*, 727 F.2d 1352 (4th Cir. 1984) (*quoting Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 24 (9th Cir.1981); *In re Horowitz*, 482 F.2d 72, 81 (2nd Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); and *Herbert v. Lando*, 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979)); *Commonwealth v. Edwards*, 235 Va. 499, 509, 370 S.E.2d 296, 301 (Va.1988). Accordingly, the privilege is narrowly construed to apply only to those situations in which the party invoking the privilege consulted an attorney for the purpose of securing a legal opinion or services and in connection with that consultation communicated information intended to be kept confidential.[13] *See In re Grand Jury Proceedings*, 727 F.2d at 1355; *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982).

■ The privilege is determined on a case-by-case basis. *See Upjohn*, 449 U.S. at 396–97, 101 S.Ct. at 686. It well-settled that the privilege protects corporate as well as individual clients, *see Upjohn*, 449 U.S.

---

stronger claim. It is settled that a court sitting in a diversity case applies the conflicts rules of the forum state. *See Klaxon Company v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Rayfield v. Lawrence*, 253 F.2d 209, 212–13 (4th Cir.1958). Virginia applies the substantive law of the place of the wrong. *See McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979). Here, Doe lives in Virginia, he was discharged while employed in Virginia, the copies of documents were apparently taken and are presumably retained in Virginia, and the confidential disclosures sought to be restrained would presumably be made in or from Virginia.

**12.** The privilege belongs to the client, not the attorney. *See Commonwealth v. Edwards*, 235 Va. 499, 509, 370 S.E.2d 296, 301. Generally, the attorney-client privilege arises under the rubric of Rule 501, Fed.R.Evid. This rule provides that "the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience." The oldest witness privilege recognized under common law is the attorney-client privilege. *See* 8 J. Wigmore, Evidence § 2290.

**13.** Moreover, the privilege protects only the communications themselves, not underlying facts, the disclosure of which may be compelled from those who communicated them to the attorney. *See Upjohn*, 449 U.S. at 395, 101 S.Ct. at 685. But the privilege attaches to an attorney's agents when such agents' services are indispensable to the attorney's effective representation of the client. *See Edwards*, 235 Va. at 509, 370 S.E.2d at 301.

at 390, 101 S.Ct. at 683,[14] and that it attaches to in-house as well as outside counsel. *See Owens–Corning Fiberglas Corp. v. Watson*, 243 Va. 128, 141, 413 S.E.2d 630, 638 (1992); *In re Sealed Case*, 737 F.2d 94, 99 (D.C.Cir.1984); *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 360 (D.Mass.1950). The party seeking to invoke the privilege bears the burden of establishing that the attorney-client relationship existed, that the particular communications at issue are privileged, and that the privilege has not been waived.[15] *See Jones*, 696 F.2d at 1072; *Edwards*, 235 Va. at 509, 370 S.E.2d at 301. The Fourth Circuit has adopted the "classic test" for application of the attorney-client privilege announced in *United Shoe Machinery Corp.*, 89 F.Supp. at 358–59:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege as been (a) claimed and (b) not waived by the client.

*See Jones*, 696 F.2d at 1072.

Under the exception to the privilege commonly known as the "crime-fraud exception," communications made for an unlawful purpose or to further an illegal scheme are not privileged.[16] For example, the attorney-client privilege is extinguished when an attorney "is consulted not with respect to past wrongdoings but rather to further a continuing or contemplated criminal or fraudulent scheme." *In re Grand Jury Subpoenas 89–3 and 89–4*, 734 F.Supp. 1207 (E.D.Va.), *modified*, 902 F.2d

**14.** At issue in *Upjohn* were subpoenaed questionnaires containing communications made by the company's employees to the company's counsel at the direction of corporate superiors in order to secure legal advice about suspected illegalities in the company's operations. The Supreme Court held that in the circumstances there presented the attorney-client privilege applied. *See Upjohn*, 449 U.S. at 394–95, 101 S.Ct. at 685. *See generally* "Corporate Attorney–Client Privilege—New Emphasis on the Lawyer's Need to Know: *Upjohn Co. v. United States*," 16 Univ.Rich.L.Rev. 141 (1981).

**15.** Waiver, which may be express or implied, occurs where a disclosure is "inconsistent with maintaining the confidential nature of the attorney-client relationship." *Jones*, 696 F.2d at 1072. *See also Edwards*, 235 Va. at 509, 370 S.E.2d at 301. For example, if a client communicates with his attorney with the intent or understanding that the attorney will reveal the content of the communication to others, the privilege is waived. Moreover, voluntary disclosure by the client to a third party waives the privilege as to both the specific communication and all other communications relating to the same subject matter. *See Jones*, 696 F.2d at 1072; *In re Sealed Case*, 676 F.2d 793, 808–09 (D.C.Cir.1982). Inadvertent disclosure to third parties may also waive the privilege if the disclosure occurs "under circumstances of such extreme or gross negligence as to warrant deeming the act of disclosure to be intentional." *See Federal Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 482 (E.D.Va. 1991) (on the facts presented, the failure to take reasonable precautions to avoid the inadvertent disclosure of three letters resulted in waiver of the privilege as to those letters).

**16.** *See Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told."); *Seventh Dist. Comm. of Va. State Bar v. Gunter*, 212 Va. 278, 183 S.E.2d 713 (1971) ("The rule of privilege is defensive, not offensive. If the communication between attorney and client relates to unlawful or fraudulent accomplishment, higher public policy, and the duty of an attorney to society as a whole, abrogates the privilege."). *See generally* 31 A.L.R.4th 458, 460–61; 81 Am.Jur.2d, Witnesses §§ 207–208. The crime-fraud exception applies only to communications about ongoing or future activities. Communications concerning past crimes or frauds are privileged, unless the privilege has otherwise been waived. *See In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1041 (2nd Cir.1984) (communications with respect to past frauds are privileged). *See also supra* note 15 (discussing waiver). Moreover, the crime-fraud exception applies without regard to the attorney's actual or constructive knowledge of the crime or fraud. *See In re Grand Jury Subpoenas 89–3 and 89–4*, 734 F.Supp. 1207, 1215 (E.D.Va.), *modified*, 902 F.2d 244 (4th Cir.1990).

244 (4th Cir.1990) (*quoting In re Grand Jury Subpoenas Duces Tecum,* 773 F.2d 204, 206 (8th Cir.1985) (citations omitted)). *See also Union Camp Corp. v. Lewis,* 385 F.2d 143, 144 (4th Cir.1967) (privilege withdrawn where lawyer's advice designed to serve his client in commission of a fraud or crime). But the privilege may also be overcome even in circumstances where the attorney is not consulted for the purpose of furthering a crime or fraudulent scheme. Thus, the privilege cannot be used as a shield to preclude disclosure of information concerning an ongoing or future crime or fraud collaterally learned by a lawyer during the course of his representation.

■ To overcome an established privilege using the crime-fraud exception, the party opposing the privilege need make only a *prima facie* showing that the communications either (i) were made for an unlawful purpose or to further an illegal scheme or (ii) reflect an ongoing or future unlawful or illegal scheme or activity. The purported crime or fraud need not be proved. *See Union Camp Corp.,* 385 F.2d at 144; *In re Grand Jury Subpoenas 89–3 and 89–4,* 734 F.Supp. at 1215; *Clark,* 289 U.S. at 15, 53 S.Ct. at 469. Requiring only a *prima facie* showing may lead to the disclosure of confidential communications that do not reflect a genuine crime or fraud. Presumably, this would occur infrequently. The alternative—requiring actual proof of the crime or fraud in lieu of the *prima facie* showing—imposes an impractical and unduly burdensome standard that tips the balance too far in favor of confidentiality and against the "full and free discovery of the truth."

The evidentiary attorney-client privilege, while more familiar, is not the lawyer's only duty of confidentiality to a client. Too often unrecognized is the broader ethical duty of an attorney to preserve a client's confidences and secrets that may fall outside the attorney-client privilege. The leading case discussing this ethical duty is the Fifth Circuit's decision in *Brennan's Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168 (5th Cir.1979). There, defendants took the position that the attorney-client privilege

barred an attorney from further representation of a former joint client. The Fifth Circuit disagreed, noting that "the fundamental flaw in defendants' position is a confusion of the attorney-client evidentiary privilege with the ethical duty to preserve a client's confidences." 590 F.2d at 172. The panel held that although a former joint client could not assert the attorney-client privilege as to matters encompassed by the former joint representation because confidences cannot arise between joint clients, a broader ethical duty protects joint clients. 590 F.2d at 172. In this regard, the court stated:

> Information ... acquired [from a client] is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it. *NCK Organization v. Bregman,* 542 F.2d 128, 133 (2d Cir.1976). The obligation of an attorney not to misuse information acquired in the course of representation serves to vindicate the trust and reliance that client's place in their attorneys. A client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the client in the same matter ... this would undermine public confidence in the legal system as a means for adjudicating disputes.

590 F.2d at 172. *See also Doe v. A Corp.,* 709 F.2d at 1046–1048 ("This broad ethical duty protects not only against disclosure of privileged communications but also against the revelation of confidential information that is not privileged."); *Heartbreak Cabaret Corp. v. Cruz & Toledo Restaurant Corp.,* 699 F.Supp. 1066, 1070 (S.D.N.Y. 1988) (citing *Brennan's* ); *Donohoe v. Consolidated Operating & Prod. Corp.,* 691 F.Supp. 109, 111 n. 4 (N.D.Ill.1988) (recognizing a broader ethical duty of confidentiality). As the Fifth Circuit sensibly recognized in *Brennan's* and *Doe,* attorney confidentiality is essential to sustaining public confidence in the legal profession and the legal system. Clients therefore have a right to enforce that confidentiality, absent specific circumstances abrogating

that right. Of course, an attorney's duty to his client is limited by his duty to comply with the law and the standards of professional conduct. *Cf. Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (noting, on the facts presented, that this limitation ensures that a client is not permitted to use false evidence).

■ Consistent with most jurisdictions, Virginia recognizes a broad duty of confidentiality in Canon 4 of the Virginia Code of Professional Responsibility, which states: "A Lawyer Should Preserve the Confidences and Secrets of a Client."[17] The corresponding Disciplinary Rules provide in relevant part:

> DR4–101. *Preservation of Confidences and Secrets of a Client.*—(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
>
> (B) Except as provided by DR 4–101(C) and (D), a lawyer shall not knowingly:
>
> (1) Reveal a confidence or secret of his client.
>
> (2) Use a confidence or secret of his client to the disadvantage of the client.
>
> (3) Use a confidence or secret of his client for the advantage of himself or a

third person, unless the client consents after full disclosure.

Thus, mandatory Disciplinary Rule 4–101 defines two categories of protected information: (i) a narrow category of "confidences," comprising information protected by the attorney-client privilege, and (ii) a broader category of "secrets," encompassing "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." In distinguishing between these two categories, Virginia has manifest its intention to protect from disclosure a range of communications broader than that protected by the attorney-client privilege.[18] Confidentiality of both categories of information must be maintained. Yet the duty of confidentiality imposed by the Virginia Code of Professional Responsibility is not absolute. A lawyer *may* reveal confidences and secrets in specific circumstances. Relevant here is a provision, similar in purpose and effect to the crime-fraud exception to the attorney-client privilege, *permitting* an attorney to reveal "[i]nformation which clearly establishes that his client has, in the course of the representation, perpetuated upon a third party a fraud related to the subject matter of the representation." Virginia Code of Professional Responsibility DR4–101(C)(3).[19] Informa-

---

**17.** Under the Virginia Code of Professional Responsibility, the Canons are "statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers." Preamble, Virginia Code of Professional Responsibility. The Disciplinary Rules, unlike the Canons, are "mandatory in character" and "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *Id.* Also contained in the Code are Ethical Considerations, which are aspirational principles toward which all attorneys should strive. *Id.*

**18.** This intention is also reflected in Ethical Consideration 4–4, which states, in pertinent part:

> The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the

nature or source of information or the fact that others share the knowledge.

Virginia Code of Professional Responsibility EC4–4.

**19.** DR4–101(C) also provides that an attorney may reveal confidential matters (i) with the consent of the clients after full disclosure, (ii) when required to do so by court order or law, and (iii) when necessary to establish the reasonableness of his fee or to defend himself or his employees or associates against an accusation of wrongful conduct. Virginia Code of Professional Responsibility DR4–101(A), (B), and (D). In addition, DR4–101(D) establishes two circumstances in which a lawyer must reveal confidences: (i) when a client states an intention to commit a crime, but only after the lawyer attempts to dissuade the client from committing the crime, and, if the crime involves perjury, attempts to withdraw as counsel; and (ii) when information clearly establishes that the client

tion "clearly establishes" the perpetration of a fraud if it is information that a reasonable attorney in the same circumstances would find convincing evidence of the alleged fraudulent activities.[20]

Yet despite its similar purpose, DR4-101(C)(3)'s "clearly establishes" standard imposes a heavier burden on the party seeking disclosure than the *prima facie* standard of the crime-fraud exception to the attorney-client privilege. In other words, matters subject to the attorney-client privilege seem to be less stringently protected from disclosure than matters subject to the ethical privilege. This, at first blush, seems puzzling, indeed paradoxical, for one would think that the attorney-client privilege deserves the greater protection. On reflection, however, the two different standards make sense given that they apply in different contexts. Succinctly put, the evidentiary attorney-client privilege arises only where disclosures are sought to be compelled in some litigation context, whereas the broader ethical duty arises in the context of voluntary or uncompelled disclosures, typically outside a litigation context. More particularly, the attorney-client privilege is an evidentiary privilege applicable where someone seeks to compel an attorney or his client to reveal communications between lawyer and client made for the purpose of securing a legal opinion or legal services and intended to be kept confidential. Thus, the privilege arises in the context of litigation and is therefore subject to discipline of the adversary process and the safeguard of judicial scrutiny, if the affected client invokes the privilege and the opposing party seeks to overcome it.[21] Significantly, however, the evidentiary attorney-client privilege does not control where disclosures occur, or potential disclosures are contemplated, in circumstances involving uncompelled disclosure and no judicial scrutiny. In such circumstances, the ethical duty—with its appropriately higher standard of protection against unwarranted disclosure of suspected fraudulent activities—governs. The voluntary nature of the actual or potential disclosures and the absence of judicial scrutiny justify the higher "clearly establishes" standard for disclosure of purported evidence of ongoing or future fraud. In sum, the *prima facie* standard under the crime-fraud exception to the attorney-client privilege is a standard applied in the litigation context by judges, not lawyers, for the purpose of deciding whether to compel the disclosure of putatively privileged material.[22] By contrast, the more stringent

has, in the course of the representation, perpetrated a fraud related to the representation upon a tribunal. Virginia Code of Professional Responsibility DR4–101(D)(1) and (2).

**20.** The advisory ABA Model Code of Professional Responsibility also requires the preservation of "confidences" and "secrets." *See* ABA Model Code of Professional Responsibility Canon 4, DR4–101(A). Interestingly, however, the ABA version takes a somewhat different approach. Under the ABA Code, a lawyer may reveal confidences or secrets (i) with the consent of the client after full disclosure; (ii) when permitted under the Disciplinary Rules or required by law or court order; (iii) when they indicate the intention of his client to commit a crime (and he may reveal information necessary to prevent the crime); and (iv) when necessary to establish or collect a fee or to defend himself or his employees against an accusation of wrongful conduct. *See* ABA Code of Professional Responsibility DR4–101(C). In a separate section, the ABA Code provides that a lawyer who receives information "clearly establishing" that his client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall call upon his client to rectify the same and, if his client refuses to comply, shall reveal the fraud, except when the information is protected as a privileged communication. *See* ABA Code of Professional Responsibility DR7–102(B). Unlike the ABA Code, the Virginia Code makes disclosure of a fraud upon a tribunal mandatory, but makes disclosure of a fraud on a person discretionary. *See* Virginia Code of Professional Responsibility DR4–101. And unlike the ABA Code, the Virginia Code does not require initial disclosure to the client in situations involving frauds on third parties. *Id.*

**21.** The evidentiary privilege only covers information defined as "confidences" in the ethical rule. *See* DR4–101(A). The privilege may not be claimed for information denominated "secrets" in that provision. *See Id.* The appropriate standard for the disclosure of "secrets" in the course of litigation is unclear, but in any event would be no higher than the *prima facie* standard applicable to "confidences."

**22.** Of course, lawyers routinely consider the attorney-client privilege (and the crime-fraud exception) in deciding whether to invoke the privilege on behalf of a client, whether to pursue

"clearly establishes" standard for disclosure of confidential information is one that is applied in the first instance by lawyers, not judges, as they struggle with the decision whether voluntarily to disclose certain confidential information they believe reflects an ongoing or future fraud. Judges apply the "clearly establishes" standard in the second instance only to review *post hoc* whether a voluntary disclosure was ethically appropriate or, as here, to decide whether to enjoin a potential voluntary disclosure.[23]

In light of these principles, any reliance here on the evidentiary attorney-client privilege and its crime-fraud exception is misplaced. This is not a case involving compelled disclosures. No one seeks to compel Doe to disclose privileged material against X Corp.'s invocation of the attorney-client privilege. Rather, this is a case of voluntary disclosure; Doe voluntarily has disclosed or wishes to disclose a broad range of information X Corp. believes should be treated confidentially. Thus, applicable here is the broader ethical duty of confidentiality and the "clearly establishes" standard for disclosure of evidence of fraud.

Given this, in proving its claim that Doe is obligated to maintain its confidences pursuant to the ethical duty, X Corp. bears the initial burden of establishing that the duty exists and that the disputed communications are subject to it. To do so, X Corp. must show, *inter alia*, that the communications sought to be protected are "confidences" or "secrets" within the meaning of Virginia Code of Professional Responsibility DR4–101(A). If X Corp. carries this burden and establishes that Doe is ethically bound not to disclose this material, the burden then shifts to Doe to show that the material and information he voluntarily disclosed or seeks to disclose "clearly establish[ ]" that during the course of Doe's representation, X Corp. perpetrated a fraud related to the subject matter of the representation upon a third party, namely, the federal government.[24] *See* Virginia Code of Professional Responsibility DR4–101(C)(3). To accomplish this, Doe must demonstrate more than mere suspicion of fraud; he must show that a reasonable attorney in his position would find the communications at issue to be convincing evidence of the perpetration of a fraud on the government during the course of his representation related to the subject matter of that representation. But the fraud itself need not be conclusively proved. Thus, the issue for trial is not whether X Corp. was in fact perpetrating a fraud on the government. Rather, the primary issues for trial are (i) what Doe knew or should have known[25] at the time of the intended disclosures (or the time X Corp. sought to enjoin disclosures) and (ii) whether a reasonable attorney with that knowledge would find that it clearly establishes an ongoing or planned fraud, that is, that it constitutes convincing evidence of an ongoing or planned fraud. If Doe satisfies the "clearly establishes" standard, disclosure is permissible (but not required), even if X Corp. ultimately proves that no fraud existed.

There may be circumstances where ongoing or contemplated frauds actually exist, but disclosure is impermissible because the

---

certain legal strategies, whether to draft documents in a particular manner, and the like. But it is judges who actually apply the *prima facie* standard in deciding whether the evidentiary privilege, once claimed and established, may be overcome under the crime-fraud exception.

**23.** Where the evidentiary attorney-client privilege applies, a lawyer does not violate his ethical obligation pursuant to court order if he reveals information that satisfies the *prima facie* standard of the crime-fraud exception, but falls short of the "clearly establishes" standard of the ethical code. *See* Virginia Code of Professional Responsibility DR4–101(C)(2) (a lawyer may reveal confidences and secrets when required by

law or court order); DR7–102(A)(3) (a lawyer shall not conceal or knowingly fail to disclose that which he is required by law to reveal).

**24.** Such a showing, if made by Doe, would also defeat X Corp.'s claim for breach of the Confidentiality Agreement. To the extent it prevented disclosure of evidence of a fraud on the government, that Agreement would be void as contrary to public policy. In other words, X Corp. cannot rely on any contract to conceal illegal activity.

**25.** This requirement safeguards against legitimizing or encouraging disclosures based on ignorance.

evidence relied on by the attorney falls short of clearly establishing the fraud. This result might permit the fraud to continue. But neither mere suspicion of fraud, nor the mere risk of undiscovered fraud, justify abrogating the duty of attorney confidentiality. A windfall to a wrongdoer may be the price exacted for the benefits conferred on the public and the legal system by vigilantly-maintained attorney confidentiality. On this point, *Doe v. A Corp.*, 709 F.2d at 1043, is instructive. In *Doe*, the Fifth Circuit held that a former in-house attorney could prosecute his personal claim for employee benefits against his former corporate employer and client, but he could not proceed as a class representative for other similarly-situated employees. *See* 709 F.2d at 1050–51. Judge Rubin held that permitting Doe to serve as a class representative would create an unacceptable tension between Doe's obligation to diligently represent the class and his ethical duty to protect A Corp.'s secrets. *See* 709 F.2d at 1047–48. Yet Judge Rubin recognized that the court's holding was not without its costs: "[i]f no other class member ever learns of the claim, it may go forever unvindicated ... [t]he lawyer's duty to his client creates the possibility that his silence will permit valid claims to lie unasserted." 709 F.2d at 1048. Similarly, it may be that if Doe's ethical duty of secrecy results in the government's inability to learn of X Corp.'s activities that Doe believes are fraudulent, potential claims by the government against X Corp. may remain unasserted.

In sum, the *Blackwelder* factors applied here counsel in favor of a preliminary injunction enjoining Doe from making further disclosures of X Corp.'s alleged confidences and secrets until such time as this matter is fully litigated. For the reasons stated above, X Corp. is likely to suffer irreparable harm if the preliminary injunction does not issue, whereas Doe is unlikely to suffer any harm, let alone irreparable harm, if the injunction is ordered. Because the "balance-of-hardships" weighs decidedly in favor of X Corp. and because the merits of the litigation raise "grave and serious questions," the Court need not con-

sider plaintiff's likelihood of success on the merits, although the Court notes in passing that at this stage in the proceedings, the evidence on the merits appears to be in equipoise.

■■■ The last *Blackwelder* factor is the public interest, which must be considered in every case. Here, the public interest pulls in two directions. On the one hand, for reasons already enunciated, public policy strongly favors enforcing the principles of attorney confidentiality. On the other hand, the public has an undeniable interest in exposing and stopping potential fraud on the government. At this point, however, the existence of fraud is uncertain, whereas the risk of damage to the attorney-client relationship is palpable and immediate. Given this, the public interest in the integrity of the legal system is stronger. It follows from this analysis of the *Blackwelder* factors that X Corp. is entitled to preliminary injunctive relief to preserve the status quo with respect to disclosures of its allegedly confidential information.

**B. X Corp.'s Request to Enjoin Doe to Return the Documents**

■■■ The mandatory aspect of X Corp.'s request for preliminary relief, that is, the return of the documents themselves, stands on a different footing, especially in light of the heavier burden X Corp. bears. *See supra* note 9 and accompanying text. Simply put, X Corp. is unlikely to suffer irreparable harm if Doe is permitted to retain document copies he took when he left X Corp.'s employ. X Corp. has all the original documents. X Corp. also has notice of the subject matter covered by the documents and thus is reasonably able to identify the documents in Doe's possession. And in light of the Court's disposition of the disclosure issue, X Corp. faces no risk that Doe will use or disseminate the documents in any manner detrimental to X Corp., other than in the defense of this case or the prosecution of his personal claims. Nor, for reasons already noted, is it clear that X Corp. is likely to prevail on the merits of the breach of the Confidentiality Agreement claim pursuant to which it

seeks recovery of the documents. Indeed, if the documents clearly establish a fraud, it is unlikely that X Corp. would prevail on that claim. Finally, no discernable pubic interest exists in mandating a return of the documents at this stage of the proceedings. To do so would merely confer on X Corp. the fruits of victory before they are earned. *See Tiffany,* 959 F.2d at 232 (table), No. 91–3001 (4th Cir. Apr. 6, 1992) (text in Westlaw). Thus, the current record does not warrant mandatory preliminary injunctive relief with respect to the return of the documents.

### *Conclusion*

In sum, the Court concludes that plaintiff's motion for preliminary injunction should be granted in part and denied in part. Specifically, an appropriately tailored preliminary injunction will issue with respect to disclosure of X Corp.'s claimed confidential information and documents. But no preliminary injunctive relief is warranted with respect to the return of documents.