**X CORP., Plaintiff,**

v.

**John DOE, Defendant.**

**Civ. No. 92–338–A (UNDER SEAL).**

United States District Court,
E.D. Virginia.
Alexandria Division.

March 25, 1993.

---

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This is the second chapter in a dispute concerning whether a former corporate house counsel may retain and disclose confidential documents and information obtained during the course of his employment because he believes they reflect an ongoing fraud perpetrated by his former employer on the federal government. In the first chapter, the Court concluded that such disclosure was permissible only if a reasonable attorney would believe that the disputed documents and information clearly established the employer-client's fraud. *See X Corp. v. Doe,* 805 F.Supp. 1298 (E.D.Va.1992) (*"X Corp. I"*). In this second chapter, the Court applies this standard to the undisputed facts.

More precisely, plaintiff, X Corp. ("X Corp."), brought this action to prevent defendant, John Doe ("Doe"), from disclosing confidential information obtained during his tenure at X Corp. and to compel him to return approximately 4,300 pages of documents he took with him following his discharge. For

his part, Doe claims that he is entitled to disclose such information and documents because they establish fraud on the part of X Corp. and, as such, fall outside the scope of Doe's ethical duty of confidentiality. Doe has also asserted a counterclaim against X Corp., alleging that he was unlawfully fired in retaliation for actions X Corp. believed he was taking in furtherance of a *qui tam* suit, in violation of the False Claims Act, 31 U.S.C. §§ 3729–3733.

At the outset, plaintiff sought a preliminary injunction, which was granted in part and denied in part. In essence, the Court preliminarily enjoined Doe from disclosing any confidential information or documents, but declined, for the time being, to mandate the return of the disputed documents to X Corp.. *See X Corp. I,* 805 F.Supp. 1298. In doing so, the Court set forth the burden of proof Doe must meet in order to prevail: put simply, he must establish that a reasonable attorney in his position would have found that the documents and information in issue clearly establish fraud. *Id.* at 1310.

This matter is before the Court on the parties' cross-motions for summary judgment on this issue and, as no material facts are disputed, it is now ripe for summary disposition. Also before the Court is X Corp.'s motion for summary judgment on Doe's counterclaim. Here, too, the material facts are undisputed. For the reasons stated below, the Court now orders the return of the disputed documents to X Corp. and grants summary judgment in favor of X Corp. both on its claims and on Doe's counterclaim.

### II.

X Corp. is a major supplier of computer equipment. At all times relevant to this action, X Corp. sold computer equipment to the federal government pursuant to contracts negotiated with the General Services Administration ("GSA"). Most of these sales were conducted under the terms of a Multiple Award Schedule Contract ("MASC") that incorporates certain standard contract provisions set forth in Part 52 of the Federal Acquisition Regulations ("FAR") System. *See* 48 C.F.R. § 52.100 *et seq.* Two FAR's, the New Materials Clause, FAR 52.210–5,

and the Price Reduction Clause, FAR 215.22, are particularly relevant here. The former requires government contractors to supply only "new, including recycled" equipment to the federal government, while the latter requires contractors to provide notice of discounts provided to commercial customers that are deeper than those received by the federal government under the relevant MASC contracts. Both FAR's were incorporated in the MASC contracts that X Corp. negotiated with the GSA during Doe's tenure as in-house corporate counsel.

X Corp. hired Doe in March 1989 as a member of its in-house legal staff based in Northern California. Formerly an Associate Deputy Attorney General of the United States and Chief of Staff to the Attorney General, Doe was a member of the bar of Pennsylvania. When he was hired, Doe executed an "Employment, Invention, and Confidential Information Agreement" ("Confidentiality Agreement"), in which he expressly agreed (i) to return to X Corp. all records obtained during, or in connection with, his employment and (ii) to preserve X Corp.'s confidential information.[1] Thereafter, in the course of his employment, Doe regularly received confidential information from X Corp. management and its employees in order to provide legal opinions and advice. During approximately two years with X Corp., Doe dealt with various matters related to X Corp.'s compliance with government regulations and the antitrust laws. Eventually, he became the in-house attorney primarily responsible for ensuring such compliance. In January 1990, shortly after he began working on compliance matters, he became concerned about X Corp.'s apparent use of remanufac-

tured components in computer systems sold as new to the government. Concerned that this practice was in violation of the FAR's New Materials Clause, Doe began an investigation. In the course of this investigation, Doe reviewed legal opinions X Corp. had previously obtained from outside counsel concerning X Corp.'s compliance with federal regulations. Believing these opinions to be inadequate, Doe informed X Corp.'s general counsel on January 31, 1990 that these opinions had "not definitively dealt" with what constituted "new" or "recycled" equipment required by the regulations.

By April of 1990, Doe had become convinced that the prudent course of action would be for X Corp. to disclose, in response to government contract solicitations, that equipment sold as new to the government could contain some remanufactured components. X Corp. then made such a disclosure. Specifically, on April 10, in response to a government solicitation for a MASC schedule contract for fiscal year 1991, X Corp. advised the GSA that, if its proposal were accepted, "[s]ome equipment sold as new may contain some used or remanufactured components which are warranted the equivalent of new." GSA accepted X Corp.'s proposal and awarded it the contract, which included the foregoing language.[2] Doe subsequently conducted a detailed study of all GSA orders during fiscal years 1989 and 1990 in order to determine whether used and/or remanufactured equipment had been shipped to the government. This study revealed that the government had received no used components and very few remanufactured components in these two years. X Corp. reported the re-

---

1. The Confidentiality Agreement provided, in pertinent part:

> All records ... coming into my possession or kept by me in connection with my employment are the exclusive property of the Company. I agree to return to the Company all such records upon termination of my employment unless specific written consent is obtained from an officer of the Company to retain any such record.
> I will regard and preserve as confidential and will not divulge to unauthorized persons, or use for any unauthorized purposes, either during or after the term of my employment, any ... information, matter or thing, of confiden-

tial, private or secret nature, connected with the ... business of the Company ... I also will not publish any information in any way relating to the Company without first obtaining the written permission of an officer of the Company to do so.

2. This particular language was included in "Terms and Conditions" section of the FY 1991 MASC Schedule. An identical provision was included in both X Corp.'s response to the GSA's FY 1992 solicitation and the "Terms and Conditions" section of the 1992 MASC Schedule, as well.

sults of this study to the GSA on May 29, 1990.[3]

Closely related to Doe's concerns over X Corp.'s compliance with the New Materials Clause were his concerns that X Corp.'s remanufactured equipment program did not comply with the FAR's Price Reduction Clause. Doe became particularly concerned with X Corp.'s procedures for segregating and tracking "new," "used" and "remanufactured" equipment and the manner in which remanufactured orders were filled. His concerns stemmed from his belief that, contrary to the FAR, X Corp. might be giving discounts to private participants in the remanufactured equipment program that it was not giving to the government.

In pursuing this matter, Doe interviewed several X Corp. employees in April 1990 concerning X Corp.'s manufacturing process and the remanufactured equipment program. One of these employees, the quality assurance manager at a X Corp. plant, informed Doe and an outside attorney that he believed remanufactured equipment orders were "frequently filled with new equipment." This same employee, later reviewed two large orders for remanufactured equipment some months after his interview and discovered that in those two orders, involving over two hundred components, less than five percent of the components supplied were "new" components. Doe's interview with this and other employees led him to undertake a more thorough investigation of X Corp.'s remanufactured equipment program. Throughout the summer and fall of 1990, Doe reviewed the policy and procedures associated with X Corp.'s handling of returned equipment and the manner in which it filled orders for both new and remanufactured equipment. In addition to information from X Corp. employees, Doe solicited advice from outside counsel and held in-house meetings with various X Corp. managers in connection with his efforts to ensure X Corp.'s compliance with both the Price Reduction and New Materials FAR's.

In November 1990, X Corp. transferred Doe to its offices in Reston, Virginia. The reasons for this transfer are hotly disputed. X Corp. claims that Doe's failure to pass the California Bar examination precipitated the transfer, while Doe contends that the transfer accomplished X Corp.'s dual goals of retaining his services and accommodating Doe's request to return to the East Coast. Whatever the reason, it is not material here. What is material is that Doe's transfer meant that he could no longer continue his investigation in person; other X Corp. employees now assumed responsibility for investigating whether X Corp.'s practices complied with the FAR's.

During the next four months, this investigation was pursued by another in-house attorney and the controller of the manufacturing group with the responsibility for stocking components and filling new and remanufactured orders. They investigated the details of X Corp.'s treatment of "new," "used" and "remanufactured" equipment, including what components were considered "new," how X Corp. treated returned material, and the manner in which new and remanufactured orders were filled. In the course of their investigation, they met with X Corp. employees involved in (i) the remanufacturing and upgrading ("upreving") of circuit boards, (ii) the procedures relating to the operation the remanufactured equipment program, and (iii) the pricing of new and remanufactured computer equipment.

This investigation disclosed a clear picture of X Corp.'s handling of new, used, and remanufactured component sales in connection with MASC contract sales to the government, and in connection with sales to non-governmental participants in the remanufactured equipment program. In essence, computer components sold in connection with

---

**3.** This disclosure, contained in a letter to the GSA, identified two, non-computer board components sold under the previous contracts that were remanufactured—one cabinet and one tape drive. In addition, the letter stated that 12.7 percent of the computer boards supplied were remanufactured, including those boards that had to be upgraded because of technical revisions that occurred even before they were first placed into a computer system. This disclosure letter reemphasized that: "Consistent with X Corp.'s commercial practices, some equipment sold as new may contain, on a random basis, some used or remanufactured components which are warranted the equivalent of new."

these sales programs were drawn from two, separate stockrooms. Stockroom 42 contained both "pristine new"—i.e., newly manufactured—components and remanufactured components that X Corp. warranted "as new." [4] From this stockroom came all equipment supplied to the government under the MASC contract. Stockroom 42 was also the source of components for commercial orders for new equipment. Stockroom 45, on the other hand, contained remanufactured components that could not be warranted "as new," but could be rebuilt to function properly.[5] Remanufactured components from this stockroom were used to fill non-governmental orders for remanufactured equipment.

Cables and circuit boards were exceptions to this general scheme for filling orders for computer equipment. All computer circuit boards, whether newly manufactured or remanufactured and warranted "as new" were placed in the "new" stockroom, Stockroom 42. While X Corp. scrapped used boards that were obsolete or had been returned more than twice, it "upreved," retested, and warranted "as new" all other returned boards. Given that all computer boards were drawn from the "new" stockroom, remanufactured computer systems supplied under the remanufactured equipment program always contained boards that were "new" or warranted as new. As for cables, X Corp. provided "new" cables with its remanufactured equipment orders, as well as with its government orders, because of the inherent unreliability of used cables. Boards and cables incorporated into the remanufactured computer systems were not separately priced. Remanufactured computer systems that included boards and cables were priced in accordance with the usual discounts provided to remanufactured equipment customers. In addition, X Corp. occasionally filled

remanufactured orders with "new" components when no remanufactured components were available. In these instances, X Corp. would charge the commercial customer the corresponding "new" prices for the components.

Throughout his tenure at the Reston office, from late 1990 through the early part of 1992, Doe monitored X Corp.'s investigation of its practices and its compliance efforts. Even after his transfer to X Corp.'s Reston office, Doe remained interested in the progress of this continuing investigation. He transmitted numerous electronic mail messages to various X Corp. employees, including the in-house attorney responsible for the investigation, concerning the need to ensure prompt compliance with federal regulations. By late 1991, Doe had become dissatisfied with the pace of X Corp.'s compliance efforts, and he expressed his dissatisfaction to certain X Corp. employees, including members of the legal department. Contemporaneous with voicing this discontent, Doe told members of X Corp.'s legal department of his concern that X Corp. was vulnerable to a *qui tam* suit. In this connection, he provided in-house attorneys with background articles relating to *qui tam* actions, as well as memoranda restating his concerns about the grave consequences of violating the False Claims Act. But Doe never told any member of the legal department or any X Corp. employee that he intended, or even contemplated, filing a *qui tam* action against X Corp.. Nor did he inform anyone that he had clandestinely commenced to copy confidential documents relating to X Corp.'s compliance efforts and investigations.

X Corp. terminated Doe's employment effective February 28, 1992. The reason for Doe's discharge is as hotly disputed as the reason for his transfer from California to

---

**4.** The "as new" remanufactured components in Stockroom 42 were used components of less than a specified age that had been rebuilt, retested, and upgraded to the current revision level—i.e., "upreved." These components were also required to be cosmetically pristine in appearance. Originally, the age limit for "upreved" components was three years from the date of manufacture. At some time during X Corp.'s investigation, this age limit was reduced to one year. Thereafter, by August 1991, this one-year rule for

non-board components was itself supplanted by a three month rule. At present, X Corp. places only "pristine new" components in the main stores, in accordance with a policy instituted in October, 1992. This latest change, however, came well after the date of Doe's attempted disclosure and is thus not material here.

**5.** Used components that could not be rebuilt to function properly were scrapped.

Virginia. X Corp. claims Doe was laid-off as part of a company-wide reduction in force involving over 700 employees. Doe counters that he was unlawfully fired in retaliation for actions X Corp. believed he was taking in furtherance of a possible *qui tam* suit. *See* 31 U.S.C. § 3730(h). On leaving X Corp., Doe took with him approximately 4,300 copies of certain documents and files, leaving the originals at X Corp. He claims these documents reveal that X Corp. defrauded the federal government, in violation of the False Claims Act. 31 U.S.C. §§ 3729—3733.

On March 5, 1992, X Corp. brought this suit. X Corp.'s complaint asserts five causes of action: (i) breach of fiduciary duty by allegedly revealing confidences to his own attorney; (ii) breach of the Confidentiality Agreement; (iii) recovery of the allegedly misappropriated documents and records; (iv) injunctive relief to prevent disclosure of alleged confidential information in his personal claim against X Corp. or for any other purpose; and (v) declaratory judgment that Doe may not disclose the allegedly confidential information.[6]

### III.

◼ Only exceptional circumstances justify an attorney's voluntary disclosure of confidential information and documents obtained in the course of his representation of a former client. As set forth in the Court's previous opinion, Doe, to prevail here, must show that the confidential information and documents he retained and seeks to disclose "clearly establish" that X Corp. is engaged in an ongoing fraud against the federal government. *X Corp. I*, 805 F.Supp. at 1308–9.[7]

Put another way, Doe must show that, given knowledge of the disputed documents and information, "a reasonable attorney in the same circumstances would find *convincing evidence* of the alleged fraudulent activities." *Id.* (emphasis added) This standard places an appropriately heavy burden on disclosing lawyers, as it balances the vital need to preserve the integrity of the attorney-client relationship against the need for disclosure in those rare circumstances where the relationship is abused.[8] Were the standard less stringent, the attorney-client relationship would be impaired. Clients would be reluctant to confide fully in their counsel for fear that confidences would be disclosed based on no more than colorable claims of fraud.

Worth noting as a preliminary matter is the limited scope of the Court's inquiry. Resolution of this dispute does not require the Court to determine whether X Corp., in fact, engaged in a fraud against the federal government in violation of the False Claims Act. Rather, the questions presented are:

(i) what Doe knew or should have known at the time of the intended disclosures ... and (ii) whether a reasonable attorney with that knowledge would find that it clearly establishes an ongoing or planned fraud, that is, that it constitutes convincing evidence of an ongoing or planned fraud."

*Id.* at 1310. Given this standard, Doe conceivably could satisfy the "clearly establishes" standard even if, in subsequent proceedings, no fraud is ultimately shown to exist. Conversely, even though fraud might actually exist, disclosure of confidential information may be impermissible if the evidence relied

---

6. The Court previously dismissed the breach of fiduciary duty claim by Order dated July 2, 1992.

7. Initially, the parties disputed whether the documents met the threshold requirement that they represent client "confidences" or "secrets." There is no doubt that they do. Many documents reflect information obtained in the context of the attorney-client relationship. Other documents fall within the attorney-client privilege, as they relate to advice from attorneys. As a whole, the body of documents clearly constitute and reflect X Corp.'s secrets and confidences. Nor is a different conclusion warranted merely because, as Doe contends, others outside of X Corp. knew

about some of the matters reflected in the documents. *See Va. Code of Professional Responsibility*, Ethical Consideration 4–4 (ethical duty of confidentiality "exists without regard·to the nature or source of the information or the fact that others share the knowledge"); *Brennan's Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir.1979) (ethical obligation of attorney precludes use of information obtained from attorney-client relationship "without regard to whether someone else may be privy to it").

8. Virginia law governs here. *See X Corp. I*, 805 F.Supp. at 1308–11. Doe advances no new or sufficient reason to reconsider this conclusion.

on by Doe falls short of clearly establishing this fraud. *X Corp. I*, 805 F.Supp. at 1311.

No material dispute exists concerning the extent of Doe's knowledge; that knowledge is reflected in, and is coextensive with, the contents of the several thousand pages of X Corp. documents retained by Doe. Consequently, the Court must determine whether these documents clearly establish fraud on the part of X Corp.

### A. *New Materials Clause Violation*

Doe claims that the documents clearly establish that X Corp. is violating the FAR's New Materials Clause, FAR 52.210–5 by incorporating remanufactured equipment in new equipment sold to the government. This claim fails; the disputed documents, while arguably suggestive of a regulatory violation, fall short of clearly showing fraud.

The New Materials Clause, FAR 52.210–5, requires X Corp. to provide "new" computer equipment to the federal government. This provision, incorporated by reference as a standard provision in the MASC contracts, provides in pertinent part, as follows:

> Unless this contract specifies otherwise, the Contractor [X Corp.] represents that the supplies and components ... are new, including recycled (not used or reconditioned) and are not of such age or so deteriorated as to impair their usefulness or safety.

48 C.F.R. § 52.210–5.

Neither party disputes that X Corp. filled all of its government orders from Stockroom 42, which contained newly manufactured components and "as new" remanufactured components. Thus, as Doe's 1990 survey disclosed, "new" computer equipment provided to the government occasionally included some remanufactured components that had been "upreved" and were warranted "as new." This, Doe argues, is a violation of the New Materials Clause. X Corp. argues, however, that the inclusion of remanufactured components in "new" equipment sold to the government does not violate the New Materials Clause because remanufactured components that have been upgraded and "warranted as new" can be considered "new." Doe then counters that "new means new," and that remanufactured components do not fall within a common sense definition of "new" computer equipment. Moreover, Doe argues that X Corp.'s undisputed failure to comply with the reporting requirements relating to the use of reconditioned parts amounts to a violation of the Clause.[9]

Ultimately, however, whether X Corp. is in violation of the New Materials Clause is a question that need not be resolved here. Nor does the Court need to resolve whether the New Materials Clause was superseded by a subsequent provision in the 1991 and 1992 MASC contracts that addressed the possible incorporation of remanufactured components. X Corp. contends that, regardless of what is considered "new" under the terms of this Clause, its contract with the GSA expressly permitted the provision of remanufactured components. Not surprisingly, Doe disagrees. He argues that the New Materials Clause takes precedence over and trumps any inconsistent contract provision that would permit the provision of remanufac-

---

**9.** The New Materials Clause does permit a contractor to provide remanufactured components under certain circumstances:

> If the Contractor believes that furnishing used or reconditioned supplies or components will be in the Government's interest, the Contractor shall so notify the Contracting Officer in writing. The Contractor's notice shall include the reasons for the request along with a proposal for any consideration to the Government if the Contracting Officer authorizes the use of used or reconditioned supplies or components.

48 C.F.R. § 52–210–5. But contractors who take advantage of this must give the government clear notice:

> If the offeror proposes to furnish items or components, which are used or reconditioned

material, ... the offeror shall provide the following as an attachment to the offer: a complete description of the items or components; quantity; name of Government agency from which acquired; and date of acquisition, if applicable. No used, reconditioned, residual inventory, or former Government surplus property other than that listed on the attachment shall be furnished under the resulting contract unless authorized in writing by the Contracting Officer.

48 C.F.R. § 52–210–6. It is undisputed that X Corp. did not provide a complete listing of the "upreved" remanufactured components it supplied to the government.

tured components, and that X Corp.'s contract with the GSA cannot be justifiably construed to permit such a practice. Yet this dispute over the construction of the contract terms, like the parties' semantic wrangling over the definition of "new" computer equipment, is immaterial to the fraud determination.

The heart of fraud is an intentional misrepresentation. A violation of a regulatory provision, in the absence of a *knowingly* false or misleading representation, does not amount to fraud. Negligent or innocent misstatements, for example, do not subject government contractors to liability for fraud. *See United States ex. rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991). Nor do such misstatements automatically amount to a crime. *Cf. United States v. Weatherspoon,* 581 F.2d 595, 601 (7th Cir.1978) (18 U.S.C. § 1001 precludes conviction for honest or negligent misstatement). The FAR's at issue here are standard contract provisions to be inserted, where appropriate, in government contracts pursuant to Part 52 of 48 C.F.R.[10] Thus, even assuming that X Corp. has violated the terms of the New Materials Clause and breached its MASC contract, it does not follow that X Corp. has also committed a fraud, in violation of the False Claims Act.

Violation of the False Claims Act occurs when a contractor "knowingly presents or causes to be presented" to the federal government a "false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (1988). "Knowingly" is defined by the statute to mean that a person, with respect to the information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information;

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent is required.

*Id.*[11] The disputed documents make apparent that X Corp.'s actions did not rise to the level of "deliberate ignorance" or "reckless disregard," much less constitute actual knowledge of a false and fraudulent representation. They reflect that X Corp. made conscientious and concerted efforts to ensure compliance with the FAR's. While these efforts may have been too slow and too tentative to suit Doe, this does not amount to convincing evidence of fraud. Instead, the pace of the efforts is more accurately attributable to the novelty and complexity of the compliance issues involved. Doe's own memoranda reflect this. No one, including Doe, had a clear understanding of what the New Materials Clause required in this context. Significantly, far from ignoring the compliance concerns, X Corp. acted to investigate the matter in order to ensure regulatory compliance.

Also significant is that X Corp. *disclosed* to the government that computer equipment supplied under the MASC contract might contain remanufactured components. Specifically, in response to the GSA's contract solicitation in April of 1990, X Corp. advised the government that: "Some equipment sold as new may contain some used or remanufactured components which are warranted as the equivalent of new." This disclosure militates persuasively against finding that the documents clearly establish fraud, for there is no knowing presentation of a false claim where, as here, X Corp. advised the government about the true nature of the equipment

---

**10.** The scope of Part 52 of the FAR regulations is defined as follows:

> This part (a) gives instructions for using provisions and clauses in solicitations and/or contracts, (b) sets forth the solicitation provisions and contract clauses prescribed by this regulation, and (c) presents a matrix listing the FAR provisions and clauses applicable to each principal contract type and/or purpose....

48 C.F.R. § 52.000.

**11.** The False Claims Act provides an appropriate benchmark in evaluating what constitutes fraud in connection with a contractor's supply of equipment to the government. Thus, disclosure would be justified if the disputed documents clearly establish a violation of this Act. Worth noting, however, is that the Act's preponderance of evidence standard is not applicable in this disclosure context. As noted above, Doe must show convincing evidence of a violation of the False Claims Act.

provided.[12] Put another way, even assuming X Corp. violated the New Materials FAR, and even further assuming that this FAR trumped the contractual provision permitting use of remanufactured components, X Corp.'s disclosure provides persuasive evidence that X Corp. did not "knowingly" make a misrepresentation.

Seeking to avoid this conclusion, Doe argues that X Corp.'s disclosure is immaterial because the government's knowledge of X Corp.'s practice of incorporating remanufactured components in "new" equipment cannot shield X Corp. from liability for fraud. Yet this argument misapprehends the effect of X Corp.'s disclosure, which serves not to inform the government that a knowing misrepresentation was made, but rather to show that no such misrepresentation was made in the first place. To be sure, it is clear that government knowledge of a misrepresentation does not shield a contractor from liability. *See Hagood, supra,* 929 F.2d 1416; *United States v. Ehrlich,* 643 F.2d 634 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981) (same). But this rule does not apply here because the disclosure points persuasively away from any conclusion that X Corp. made a knowing misrepresentation.[13]

## B. *Price Reduction Clause*

Nor do the documents clearly establish fraud by X Corp. in connection with the Price Reduction Clause, FAR 52.215–22. 48 C.F.R. § 52.215–22.[14] This FAR, in effect, requires X Corp. to give notice to the government of discounts provided to commercial customers that are deeper than the twenty-one percent discount provided to the government under the MASC contracts. Doe claims that X Corp. violated the Price Reduction Clause, and that this is evidence of fraud because X Corp. knew it charged the government more than it charged commercial, remanufactured equipment customers for the *same* computer equipment. To establish this fraud, Doe relies primarily on X Corp.'s practice of incorporating "new" and "warranted as new" computer components in remanufactured computer systems. Distilled to its essence, Doe's claim is that remanufactured systems were equivalent to "new" systems, but that X Corp. sold remanufactured systems at lower prices than the "new" systems it sold to the government.

The flaw in Doe's argument is the equation of "new" equipment with remanufactured equipment. While it is undisputed that X Corp. incorporated "new" or "warranted as new" boards and cables in remanufactured computer systems, this practice does not render these systems the equivalent of "new" systems sold to the government. Indeed, "new" computer systems differed from remanufactured systems in two, principal respects. First, these systems embodied the newest technology that was generally unavailable to remanufactured customers. Second, remanufactured computer systems con-

**12.** *See United States ex rel. Kreindler & Kreindler v. United Technologies,* 985 F.2d 1148 (2d Cir. 1993). The court in this recent contractor fraud case noted in dicta that:

The fact that a contractor fully disclosed all information to the government may show that the contractor has not "knowingly" submitted a false claim, that is, that it did not act with "deliberate ignorance" or "reckless disregard for the truth."

**13.** Doe also argues that letters from X Corp. to the GSA subsequent to the disclosure seem to concede that X Corp. could not, under its contract, supply "remanufactured equipment" to the government. Doe contends these letters were false statements designed to mislead the government. The plausible, albeit disputed, explanation proffered by X Corp. is that these letters simply meant that the GSA had chosen not to participate in the remanufactured equipment program. According to X Corp., these letters did not mean that "new" equipment contained no remanufactured components. Given the record as a whole, and X Corp.'s disclosure in particular, these letters do not constitute convincing evidence of fraud.

**14.** This FAR provides, in relevant part, as follows:

(a) If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by a significant amount because (1) the Contractor or a subcontractor furnished cost or pricing data that were not complete, accurate, and current as certified in its Certificate of Current Cost of Pricing Data ... the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.....

48 C.F.R. § 52.215–22.

tained, in addition to "new" boards and ca-
bles, other "peripheral" components—e.g.,
disk drives, cabinets, and printers—that
were drawn from the "remanufactured equip-
ment" stockroom, Stockroom 45. "New"
computer systems sold to the government, on
the other hand, contained components drawn
exclusively from X Corp.'s "new" stockroom,
Stockroom 42. Thus, while both "new" and
remanufactured computer systems contained
"new" boards and cables, "new" systems sold
to the government were, taken as a whole,
more valuable than remanufactured systems.
Given this, X Corp.'s differential pricing of
"new" and remanufactured systems clearly
does not constitute fraud.[15]

In sum, Doe has failed to meet his burden
of establishing that the documents reflect
convincing evidence of fraud in connection
with both the New Materials and Price Re-
duction FAR's. Put another way, Doe has
failed to show that his proposed voluntary
disclosure is justified given the compelling
public interest in preserving the integrity of
the attorney-client relationship. Given this,
the disputed documents must be returned
and Doe permanently enjoined from volun-
tarily disclosing X Corp.'s confidences and
secrets. In reaching this result, however,
the Court expresses no opinion on the merits
of any possible qui tam action that may be
brought by the government or Doe to en-
force the False Claims Act.[16]

## IV.

■ Independent of the central dispute
relating to Doe's attempted disclosure of con-
fidential information is his counterclaim that
X Corp. fired him in retaliation for acts he

took in furtherance of a qui tam suit. Such
retaliation is prohibited by the "whistleblow-
er" provision of the False Claims Act, 31
U.S.C. § 3730(h), which provides in pertinent
part, as follows:

> Any employee who is discharged ... be-
> cause of lawful acts done by the employee
> on behalf of the employee or others in
> furtherance of an action under this section,
> including investigation for, initiation of,
> testimony for, or assistance in an action
> filed or to be filed under this section, shall
> be entitled to all relief necessary to make
> the employee whole.

*Id.* Thus, in order to prevail on his counter-
claim, Doe must prove (i) he took acts in
furtherance of a qui tam suit; (ii) X Corp.
knew of these acts; and (iii) X Corp. dis-
charged him because of these acts. This he
cannot do.

In the first place, no evidence exists in the
record that Doe initiated, testified for, or in
any way assisted in, the filing of a qui tam
action during his tenure at X Corp. Indeed,
while Doe alleges that he took certain actions
that X Corp. could have construed as acts in
furtherance of a qui tam suit, it appears that
Doe, as corporate counsel, did not take these
in order to facilitate a qui tam suit, but to
prod X Corp. to pursue compliance efforts
more vigorously. Doe, for example, made
statements to members of X Corp.'s legal
staff, including one member of the Manage-
ment Committee, concerning X Corp.'s possi-
ble exposure to a qui tam action. In addi-
tion, Doe circulated articles and memoranda
relating to qui tam actions, IBM's difficulties
with False Claims Act liability, and the False
Claims Act in general. These actions, how-

**15.** Doe makes a further claim of fraud based on the undisputed fact that a X Corp. employee informed Doe in early 1990 that remanufactured equipment orders were "frequently filled with new equipment." This is hardly convincing evi-
dence that X Corp. fraudulently overcharged the government for "new" equipment, especially in light of this employee's later determination he had provided Doe with incorrect information. Nor does the fact that remanufactured orders for individual components may have occasionally been filled with "new" components constitute such convincing evidence of fraud. Where re-
manufactured parts were unavailable, "new" components, priced as "new," were supplied to remanufactured equipment customers. Admit-

tedly, one of the submitted documents reflects that the same computer boards were sold to "new" and remanufactured customers for differ-
ent prices. This documents is somewhat trou-
bling and arguably reflect questionable business practices on the part of X Corp. Yet this docu-
ment falls far short of clearly establishing fraud.

**16.** Doe's argument that no injunction should is-
sue because X Corp. cannot prove damages re-
sulting from his proposed disclosure lacks merit.
X Corp. has prevailed on the merits, and, in light of the potential damage to its business reputation and the attorney-client relationship, injunctive relief is entirely appropriate.

ever, represented no more than Doe's efforts to fulfill his responsibility to raise relevant legal issues. These actions do not suggest that Doe had a brought *qui tam* action, nor that he even contemplated bringing such an action. Doe must establish that his acts can be construed as taken in furtherance of a *qui tam* action because no retaliatory discharge is established if Doe's discharge simply resulted from an adverse reaction to persistence in urging compliance. *Cf. Hardin v. DuPont Scandinavia,* 731 F.Supp. 1202, 1205 (S.D.N.Y.1990) (plaintiff failed to state a claim under 3730(h) because her "alleged loss was the result of her refusal to participate in the alleged scheme, not the result of steps taken in furtherance of the action"). Only Doe's actions in secretly copying and removing documents from X Corp.'s premises can be possibly construed as an act in furtherance of a *qui tam* action. Yet, it is undisputed that Doe did not inform anyone of this clandestine activity. Thus, no causal relationship exists between these acts and Doe's termination, given that the Management Committee could not have known of Doe's actions.

This inability to establish a causal relationship between his acts and X Corp.'s termination decision is fatal to Doe's counterclaim. Even assuming, *arguendo,* that Doe's acts were directed to support a *qui tam* suit, he offers little but his own naked opinion that the Management Committee (i) knew of his acts and (ii) decided to fire him because it believed that he was taking steps in furtherance of such a suit. Significantly, it is undisputed that Doe never informed any X Corp. employee that he contemplated filing a *qui tam* action. And while Doe did raise to one

member of the Committee his concerns relating to *qui tam* and X Corp.'s potential liability under the False Claims Act, there is no evidence that this member believed that Doe's acts were directed to the initiation of a *qui tam* action or that he informed the other members of the Committee of Doe's acts. The record further reflects that the Management Committee neither discussed *qui tam* suits nor Doe's efforts to ensure X Corp.'s compliance with the False Claims Act. The record also reflects that three of the four members of the Committee had never heard of a *qui tam* suit at the time that the termination decision was made.

To establish the requisite causal link between his actions and the Management Committee's termination decision, Doe relies on an insupportably fragile chain of inferences. In essence, Doe's claim requires the Court (i) to infer that the Committee member contacted by Doe viewed Doe's expressions of concern and his circulation of various memoranda and articles as representing acts in furtherance of a *qui tam* suit; (ii) that this member passed on these concerns to other members of the Management Committee or that they had been informed of these concerns by other individuals; and (iii) that the Management Committee decided to terminate Doe because it believed that these actions were being taken in furtherance of a *qui tam* suit. While Doe, as the nonmovant, is entitled on summary judgment to the benefit of all reasonable inferences, this chain of inferences requires the Court to stretch too far to find a genuine, material issue of fact. As such, the Court finds, as a matter of law, that Doe's counterclaim does not survive summary judgment.[17]

---

17. It is well established that if the evidence is merely colorable or not sufficiently probative, summary judgment should be granted. *Petra Int'l Banking Corp. v. First American Bank,* 758 F.Supp. 1120 (E.D.Va.1991). *Moreover, entry of summary judgment is appropriate if the evidence is insufficient to permit a reasonable finder of fact to return a verdict for the plaintiff. Hicks v. Phipps,* 765 F.Supp. 1541 (W.D.Va.1990). As stated above, Doe essentially relies on his own belief that he was discharged because of the Management Committee believed his actions were in furtherance of a *qui tam* suit. But Doe's beliefs, no matter how firmly held, are not themselves sufficient to withstand entry of summary

judgment. *Cf. Goldberg v. B. Green & Co., Inc.,* 836 F.2d 845, 849 (4th Cir.1988) (holding in ADEA case that plaintiff's opinion and conclusory assertions of state of mind and motivation insufficient to withstand summary judgment); *Collins v. Allied–Signal, Inc.,* 128 F.R.D. 643, 646 (E.D.Va.1989) *aff'd without op.* 889 F.2d 1084 (4th Cir.1989) (holding in discriminatory discharge case that plaintiff "has the burden of producing 'rationally probative evidence' ... which shows the 'probability' and not mere 'possibility' of discriminatory motive ... [H]is opinion and speculation, and those of his counsel, are not probative or sufficient to even infer discriminatory intent.")

## V.

In conclusion, the Court grants summary judgment for X Corp. on its claims and Doe's counterclaim. Accordingly, the Court will order the return of the disputed documents and enjoin Doe from voluntarily disclosing X Corp.'s confidential documents and information. An appropriate order will issue.

Doe also argues that X Corp.'s reasons for discharging him were pretextual. The issue of pretext need not be reached because Doe cannot establish the causal link required to establish a valid retaliatory discharge claim under the False Claims Act.