No. 88–6438. KEENAN *v.* CALIFORNIA. Sup. Ct. Cal. Certiorari denied.

JUSTICE BRENNAN, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 227 (1976), I would grant certiorari and vacate the death sentence in this case.

JUSTICE MARSHALL, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia,* 428 U. S. 153, 231 (1976) (MARSHALL J., dissenting), I would grant the petition for certiorari and vacate the death sentence in this case. But

even if I did not hold this view, I would still grant the petition. The record in this case strongly suggests that, in the words of the dissenting judge below, "certain remarks by the court during the penalty phase, superimposed upon an emotional episode that had already occurred in the jury room, had an improperly coercive effect upon the jury's deliberations and improperly influenced the verdict." 46 Cal. 3d 478, 545, 758 P. 2d 1081, 1124 (1988) (Kaufman, J., dissenting in part). I would therefore grant certiorari, both to ascertain whether petitioner was denied his right to an uncoerced verdict, and to clarify our standards for determining jury coercion, a subject discussed most recently in *Lowenfield* v. *Phelps*, 484 U. S. 231 (1988).

The penalty phase in question was described at length in the majority and partially dissenting opinions below, 46 Cal. 3d, at 527–544, 758 P. 2d, at 1112–1124 (majority opinion); *id.*, at 545–550, 758 P. 2d, at 1124–1129 (Kaufman, J., dissenting in part), and so only a brief account is necessary here. During jury deliberations, only one juror held out: an elderly woman who refused to vote to impose the death penalty. After a day of deliberations, another juror rose out of his chair and verbally attacked her in a tirade that apparently included a death threat. *Id.*, at 545, 758 P. 2d, at 1125. Crying and shaking, she left the jury room and went to a bathroom, where she vomited. In response, the foreman sent the judge notes indicating that there was one holdout against imposing the death penalty. *Ibid.*

The judge then recalled the jury. He told the jury that the court was required to investigate the jury's "problem" by questioning the foreman and, perhaps, "'the one or more jurors who may be having difficulty in reaching a verdict.'" *Id.*, at 546, 758 P. 2d, at 1125. He added that, if necessary, he would determine whether or not "one or more of the jurors are refusing to adhere to the law and the evidence," *ibid.* (emphasis omitted); he added that he had expected that the jury would have delivered a verdict by then. *Id.*, at 546, 758 P. 2d, at 1126. The judge told the jurors that he was sending them home for the weekend so that they could search their consciences. He then recognized the foreman, who stated that the weekend release would be a "fine gesture," and that "we should have a verdict come Monday." *Ibid.* The judge responded: "Good. Well, I'm glad to hear you say that. I appreciate that." *Ibid.* After only one hour of delib-

erations Monday morning, the jurors voted unanimously to impose the death penalty.

In *Lowenfield*, the Court observed that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." 484 U. S., at 241. To determine if coercion has occurred, courts must "consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'" *Id.*, at 237 (citation omitted). We held that the particular supplemental charges and jury polling at issue had not resulted in coercion, but that other instructions and comments might require a different conclusion. *Id.*, at 241.

In my view, this case presents a far more compelling circumstance for finding jury coercion than did *Lowenfield*. As the dissenting judge below observed, the holdout juror, given her emotional condition, the verbal attack upon her, and the judge's indication that he would have to investigate one or more jurors

> "may well have interpreted these statements as meaning the court *expected* a verdict on Monday and that it wanted *her personally* to resolve any lingering doubts she may have had about the appropriateness of imposing the death penalty. It is also highly likely [she] believed that, by agreeing to the death verdict on Monday, she could avoid the threatened investigation by the court and the attorneys of the jury room incident and of her reluctance to vote for death." 46 Cal. 3d, at 547–548, 758 P. 2d, at 1127.

The petitioner here was entitled to have the decision whether he "deserve[d] to live or die . . . made on scales that are not deliberately tipped toward death." *Witherspoon* v. *Illinois*, 391 U. S. 510, 521–522, n. 20 (1968). Because the actions of the trial judge in this case raise serious doubts about whether the context and circumstances of the death sentence in this case were coercive, and thus whether the scales of justice were in equipoise when the time for that decision came, I would grant the petition for review. I dissent.