## In re GRAND JURY SUBPOENAS 89–3 AND 89–4.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 13, 1990.

---

**8.** The court, therefore, finds no need to discuss defendants' motion to strike plaintiffs' jury demand.

Mark J. Hulkower, Asst. U.S. Atty., Alexandria, Va.

Richard Seaman, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C.

## MEMORANDUM OPINION

ELLIS, District Judge.

The matter is before the Court on a Motion to Quash two subpoenas *duces tecum*. The first was served on movant corporation. The second was served on a corporation now independently owned, but formerly a wholly-owned subsidiary of movant corporation. Documents sought in the subpoenas span a six-year period (1983–89) during which the subsidiary corporation existed first as an unincorporated division of the movant, then later as a wholly-owned incorporated subsidiary, and finally as a separate, independently-owned company. Movant resists production of a number of these documents by asserting attorney-client and work product privileges. The former subsidiary wishes to waive these privileges and produce the documents. Hence, the Motion to Quash presents the following questions for decision:

(1) Who controls the attorney-client/work product privileges of a wholly-owned corporate subsidiary after it is sold by its parent with respect to documents generated by the corporation while it was wholly-owned?

Or, put another way:

Can a former parent corporation invoke the attorney-client/work product privileges with respect to such documents and thereby prevent the former subsidiary from waiving the privileges and disclosing the documents?

(2) With respect to certain documents voluntarily disclosed, what is the scope of the waiver?

(3) Has the government made the requisite showing of need to overcome the work product privilege asserted with respect to employee interviews conducted in connection with a lawyer-directed corporate investigation?

(4) Does the crime-fraud exception operate in this context to override any asserted privileges?

Each of these questions is separately considered following a brief recitation of the pertinent facts.

### Facts

In June 1984, the United States Army awarded a computer time share conversion contract (the "Contract") to the movant corporation ("Movant"). A specific division of Movant (the "Division") was charged with responsibility for administering and performing the Contract. In March 1988, Movant transformed the Division into a wholly-owned subsidiary (the "Subsidiary"). Thereafter, Movant began to sell various quantities of its stock in the Subsidiary. By 1989, Movant had sold first a majority, and then all, of its Subsidiary stock to independent investors. Throughout this period, first the Division, and then the Subsidiary, generated documents in connection with administering and performing the Contract.

In 1989, two grand juries sitting in the Eastern District of Virginia, Grand Juries 89–3 and 89–4, began investigating allegations that Movant, in the course of performing the Contract, improperly acquired a proprietary computer object code [1] ("COC") belonging to a third company. Evidence adduced in the investigation indicates that Movant's employees, in late 1984, accessed the third company's computer and ordered a "computer dump" [2] of proprietary code and then placed this material in the operating system of its own computer. Thereafter, Movant, in the course of performing under the Contract, made numerous deliveries of computer code to the government containing the improperly acquired COC. Also, the government believes that a Movant executive may have made false representations to the United States in an attempt to conceal misappropriation of the proprietary COC.

In connection with their investigations, the grand juries each issued a subpoena for

---

1. This code consists of a machine readable binary language that regulates the operations of the computer.

2. A "computer dump" is a transfer of the code on to a tape or disk, which can then be used to introduce the code to another computer system. The transfer may also occur directly between two computer systems using a modem.

documents. Both subpoenas are subjects of Movant's motion to quash. Grand Jury 89–3 issued a subpoena *duces tecum* to Movant's records custodian commanding production of various categories of documents relating to performance of the Contract. This subpoena covers the time period from 1983 to the present. Movant advised the government that it would decline to produce any privileged documents and furnished the Court and the government with an index of these documents.

The second subpoena *duces tecum* was issued by Grand Jury 89–4. It is addressed to the Subsidiary's records custodian and requires production of twelve broad categories of documents relating to performance of the Contract. This subpoena covers the time period from 1984 to the present. The Subsidiary advised the government and Movant that it intended to cooperate fully with the investigation, waive all applicable privileges and produce all responsive documents in its possession. Movant, however, instructed the Subsidiary to withhold all privileged documents as Movant intended to assert all applicable privileges to any eligible documents. Movant has also furnished the Court and government with an index of the documents in the Subsidiary's possession responsive to the 89–4 subpoena that Movant claims are privileged and hence, immune from disclosure.

In sum, then, Movant seeks to quash both subpoenas, contending that it has the power to assert the attorney-client and work product privileges as to the documents in the Subsidiary's possession, as well as to documents solely in its possession. Temporally, the documents sought apparently fall into three groups. Group I documents are those prepared during the existence of the Division and prior to the creation of the Subsidiary, roughly 1983–1987. Group II documents are those generated while the Subsidiary was owned, in whole, or in major part, by Movant. Finally, Group III documents are those that came into existence after a controlling share of the Subsidiary's stock passed to independent investors.

With these facts as background, the Court turns next to an analysis of the questions presented as they apply to each category of documents and each subpoena.

## Analysis

### I. *Movant's Burden*

Movant, as the party seeking to quash validly issued grand jury subpoenas, bears a substantial burden of proof to prevail. *See, e.g., In re Grand Jury Investigation,* 769 F.2d 1485, 1487 (11th Cir.1985) (government need not make a preliminary showing of relevance or need before enforcement of a grand jury subpoena). It is well established that "the presumption of regularity that attaches to grand jury proceedings applies with equal force to duly-issued subpoenas, with the result that the burden rests on the party resisting the subpoena to show that the information sought is privileged, or that there has been an abuse of the grand jury process." *In re Grand Jury 89–4 Subpoena Duces Tecum,* 727 F.Supp. 265, 267 (E.D.Va.1989) (*citing In re United States Grand Jury Proceedings (Cid),* 767 F.2d 1131, 1133 (5th Cir.1985)); *In re Special Grand Jury, No. 81–1* (Harvey), 676 F.2d 1005, 1010, *withdrawn on other grounds,* 697 F.2d 112 (4th Cir.1982). And, as a claim of attorney-client privilege is viewed as "inconsistent with the general duty to disclose and impedes investigation of the truth" it must be strictly construed. *United States v. (Under Seal),* 748 F.2d 871, 875 (4th Cir.1984). With this burden standard as its lens, the Court focuses next on the questions raised by Movant's Motion to Quash.

### II. *The Exercise of the Privileges*

■ Whether a parent corporation controls the attorney-client/work product privileges of a wholly-owned subsidiary after its sale is a question of first impression in this Circuit. Analysis properly begins with *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). There, the Supreme Court held that a trustee of a corporation in bankruptcy has the power to waive the debtor corporation's attorney-

client privilege with respect to confidential communications occurring prior to the bankruptcy filing. *Id.* In the Supreme Court's view, this result followed from the fact that the control of the corporation had passed from the corporation's officers and directors to the trustee. The principle of *Weintraub*, therefore, is that invoking or waiving a corporation's privileges is an incident of control of the corporation.[3] And, although stated in the bankruptcy context, Justice Marshall made clear that the principle applies in other contexts as well. He wrote:

> New managers installed as a result of a takeover merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers....

471 U.S. at 349, 105 S.Ct. at 1991. Several district courts, following this dictum, have applied the *Weintraub* principle in contexts beyond bankruptcy. These courts have held that a corporation cannot preclude its former wholly-owned subsidiary from waiving the attorney-client privilege. *See Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 689 F.Supp. 841, 844 (N.D. Ill.1988) (new owners of a subsidiary can unilaterally waive the attorney-client privilege as to communication made prior to the sale between officers of the subsidiary and their in-house counsel at the former parent

corporation); *Polycast Technology Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47 (S.D.N.Y. 1989) (same); *In re Sealed Case*, 120 F.R.D. 66, 70 (N.D.Ill.1988) ("a normal consequence of a succession of corporate management, ... is that the new management has the authority to assert or waive the corporation's privilege based on their determination of the best interests of the corporation").

 The sensible rationale of *Weintraub* and its progeny is that the management of a subsidiary that has been sold must be free to fulfill its fiduciary obligation to act in the best interests of the new owners. This freedom to act in the best interests of the new owners must include the important power to invoke or waive the corporation's evidentiary privileges without interference from the former parent corporation.[4] What matters insofar as the sold subsidiary is concerned is whether the waiver of privileges is in the interests of the new owners, not the former owners. In sum, the principle that emerges from *Weintraub* and the subsequent decisions is that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Weintraub*, 471 U.S. at 349, 105 S.Ct. at 1991.[5]

 The application of this principle to the various groups of documents and to the two subpoenas yields varying results.

**3.** A transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass. Movant's reliance on *Sobol v. Dutton, Inc.*, 112 F.R.D. 99 (S.D.N.Y.1986), is therefore unavailing as that case merely held that a publishing company's evidentiary privileges did not pass to the purchaser of certain limited assets, namely the contract rights relating to a specific author.

**4.** When a corporation's officers and directors invoke or waive a privilege, they must do so consistent with their fiduciary duty to act in the best interests of the corporation. The bankruptcy trustee in *Weintraub* also had a fiduciary obligation in connection with the exercise of the bankrupt corporation's privilege. In that context, however, the fact that the corporation was in bankruptcy meant that the trustee's duty ran

to the corporation's creditors to maximize their distributions. *In re Rigden*, 795 F.2d 727, 730 (9th Cir.1986); *See also, In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357 (9th Cir.1983) (bankruptcy trustee is a fiduciary of each creditor) (citations omitted).

**5.** Of course, the parties are free to vary this result by contract. The entity selling control may condition the sale on the purchaser's agreement to grant the seller a veto over any future privilege waivers involving documents generated during the period of seller's ownership. In the absence of such a contract provision, the parties are treated as having contracted on the assumption that, after the sale, the management of the divested corporation will control the attorney-client privilege *as to these documents. See In re Sealed Case*, 120 F.R.D. at 70.

First, the *Weintraub* principle compels the conclusion that Movant cannot invoke the attorney-client work product privilege principle to override the Subsidiary's waiver in connection with the 89–4 subpoenaed Group II and Group III documents in the subsidiary's possession. Manifestly, Movant has no standing whatever to claim any privilege with regard to Group III documents, as these documents were created after Movant sold its controlling interest in the ownership of Subsidiary. The Subsidiary must produce these documents.

■ The *Weintraub* principle compels the same result with respect to Category II documents: Movant cannot override the Subsidiary's waiver of privileges and prevent the disclosure of those Group II documents in the Subsidiary's possession called for in the 89–4 subpoena. The new management of the Subsidiary must not be precluded from exercising its power to waive privileges "in the exercise of their fiduciary duty to act in the best interest of the corporation." *Medcom Holding Co.,* 689 F.Supp at 844.

Seeking to avoid this result, Movant contends that as to Group II documents, the privileges are shared by Movant and the Subsidiary because the documents were generated during the period that the Subsidiary existed and was controlled by Movant. According to Movant, the joint nature of the privileges means that no waiver is effective unless both privilege-holders consent. In support, Movant relies on authorities concerning the "joint defense" privilege, which indeed hold that consent of all parties to that privilege is required for effective waiver.[6] This reliance is misplaced; no "joint defense" privilege exists here. Such a privilege exists only when, as did not occur here, the protected communications are made in the joint contemplation or preparation of a defense. When parties collaborate to prepare a joint defense, there is an implicit agreement among the parties to permit waiver only if all consent. Here,

there is no joint defense and no agreement by named parties to a litigation concerning a defense. Instead, Movant claims that a joint defense privilege was created simply by its cooperation with the Subsidiary in pursuing the Movant's claim against the government for performance of the Contract. In connection with the Subsidiary's cooperation, Movant agreed that the Subsidiary would receive a portion of any monetary award recovered. In essence, therefore, Movant invites the Court to extend the joint defense privilege to include entities who are not parties to the litigation, but who merely have a pecuniary interest in it. The Court declines this invitation. Movant cites no apposite or persuasive authority for this novel argument. Moreover, no good reason in principle exists for doing so. To extend the joint defense privilege to non-parties simply because they are financially interested in the litigation stretches the rationale for the privilege beyond its reach.

This is simply a case of a parent and its subsidiary cooperating to assert the parent's claim. In these circumstances, Movant and the Subsidiary may share a privilege as to Group II documents, but Movant cannot preclude the Subsidiary from waiving the privilege as to the Group II documents it possesses. Courts squarely considering this issue agree that a unilateral waiver of privilege by a subsidiary that has been sold is effective as to documents in its possession and cannot be blocked by a former parent corporation. *See Medcom Holding Co.,* 689 F.Supp. at 844, 846; *In re Sealed Case,* 120 F.R.D. at 68 (new management of sold subsidiary may waive the privilege "with respect to communications made by former officers and directors"); *Polycast Technology Corp.,* 125 F.R.D. at 49–51. Accordingly, Movant cannot block or veto Subsidiary's decision to waive the privileges in connection with the Group II documents in Subsidiary's possession. The Group II documents called for in

---

**6.** *See United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989) (joint defense privilege applies where "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel"); *United States*

*v. Moscony,* 697 F.Supp. 888 (E.D.Pa.1988) (joint defense privilege applicable in grand jury investigations); *United States v. American Telephone and Telegraph Co.,* 86 F.R.D. 603, 616 (D.D.C. 1979).

the 89–4 subpoena must, therefore, be produced.

■ A different analysis is required for Group I documents in the Subsidiary's possession. These documents were generated during the life of the Division. The Subsidiary did not then exist. During this period, Movant was the sole owner of the privileges. When the Division was transformed into the Subsidiary, the Group I documents presumably passed into the Subsidiary's custody. It is unclear whether the Subsidiary, by virtue of this event, acquired a right to the privileges in the Group I documents. If so, then the analysis applicable to the Group II documents would apply here as well and the same result would obtain. In any event, this aspect of the motion may be resolved without confronting this somewhat metaphysical issue. Movant, it appears, permitted at least some of these documents to remain in the Subsidiary's custody and control after the sale of the Subsidiary. In so doing, it effectively waived its privilege with respect to these documents.

■ In sum, Movant's assertion of privilege cannot block the Subsidiary's compliance with the 89–4 subpoena. The Subsidiary must produce the Group I, II and III documents in its possession and called for in the 89–4 subpoena. A somewhat different result obtains with respect to the 89–3 subpoena. Because that subpoena is aimed at documents in Movant's possession, the *Weintraub* analysis does not apply. Movant plainly has a claim of privilege with respect to Group I and II documents in its possession.[7] Absent waiver, therefore, Movant is entitled to assert the privileges with respect to these documents. But to the extent that these documents or copies are currently also in the Subsidiary's possession, a waiver has occurred and they must be produced.[8] On the other hand, if Movant is in sole possession of any of these documents, its privileges are valid as to

qualified confidential attorney-client communications and attorney work product. Thus, the 89–3 subpoena is not effective to compel Movant to produce privileged Group I documents exclusively in Movant's custody.

### III. *Partial Waiver*

In 1988, Movant pursued a civil claim against the U.S. Army for additional compensation relating to its performance of the Contract. In this connection it voluntarily produced various documents, including two that the government claims involve confidential attorney-client communications. Their voluntary production, the government contends, operates to waive the privilege not just as to the two documents, but as to all otherwise privileged documents dealing with the same subject matter.

■ This Circuit adheres to a full subject-matter waiver rule as to the attorney-client and non-opinion work product privileges. Disclosure of a privileged communication waives the privilege as "to all information related to the same subject matter." *In re Martin Marietta Corp.*, 856 F.2d 619, 623 (4th Cir.) *cert. denied*, — U.S. —, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989); *see also United States v. (Under Seal)*, 748 F.2d 871, 875 (4th Cir.1984); *In re Subpoena Duces Tecum*, 738 F.2d 1367, 1369 (D.C. Cir.1984) (citations omitted); *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir.1984). Opinion work product is subject to a more limited waiver rule. *See In re Martin Marietta Corp.*, 856 F.2d at 623. Waiver of such material is limited to the information or documents actually disclosed.

■ These principles, when applied to the two documents in question, lead to the conclusion that no subject matter waiver has occurred. The documents are not themselves privileged; they contain no confidential attorney-client communications. As such, their voluntary disclosure waives

---

**7.** Movant presumably has no Group III documents in its possession. But should it have such documents, they must be produced; for no facts or reasons have been adduced to suggest that Movant has any privilege relating to them.

**8.** Movant represented to the Court that there exist some Group I and II documents exclusively in the Movant's possession.

no privilege. In reaching this conclusion, the Court relied on the documents themselves, as well as an affidavit, submitted by the government, from a former Movant employee who is currently an employee of the Subsidiary. The affiant states that the November 18, 1984 document is a memorandum he received that addresses, *inter alia,* whether the COC was proprietary. It indicates that Movant's legal counsel would be consulted for an opinion on the proprietary nature of the COC. This is not a confidential communication from a client to its attorney; it is a communication among employees of the client, none of whom is house counsel. It is therefore not privileged. This same conclusion applies with respect to the November 26, 1984 memorandum. That memorandum, authored by the affiant, merely suggests what questions should be asked of house counsel concerning the proprietary nature of the COC. Again, the memorandum is not addressed or sent to any lawyer. It is not an attorney client communication. In sum, no privilege waiver has occurred and hence, there is no occasion for the application of the *Marietta* principle.

## IV. *Compelling Need for Employee Interviews*

In the course of its inquiry, the government has learned that a senior official of the Subsidiary instructed in-house counsel to conduct an investigation concerning the alleged misappropriation of the proprietary COC. Apparently, this investigation included counsel's interviews of employees and these interviews were documented. To the extent that the documents reflect counsel's mental impressions and legal theories, Movant contends they are work product and need not be produced. In response, the government argues that it has shown the requisite "compelling need" to overcome this privilege.[9]

 It is well settled that "attorney work product involving the mental process of attorneys should be divulged, if at all, only on a strong showing 'of necessity and unavailability by other means.'" *In re John Doe Corp.,* 675 F.2d 482, 492 (2nd Cir.1982) (citing *Upjohn Co. v. U.S.,* 449 U.S. 383, 402, 101 S.Ct. 677, 689, 66 L.Ed.2d 584 (1981)). The Second Circuit's *John Doe* decision is factually close in point. There, as here, a grand jury sought documents reflecting corporate counsel's interviews of company employees generated in connection with an internal investigation. The company resisted production on work product grounds. The Second Circuit rejected this contention and ordered production of the interview documents, finding that the government had made an adequate showing of need to overcome the privilege. Central to the Court's conclusion was the substantial age of the case, the fact that at least one of the employee's memory had grown hazy, and the fact that the remaining employees had invoked their privilege against self incrimination. The Court also noted as significant that the government sought only "what employee A and B said, not the attorneys' evaluation of potential liability or thoughts as to use at trial." *Id.* at 492. And the Court recognized that these interviews were needed because "quite apart from the truth of the matters therein, the statements may be relevant simply for the fact that they were made ... [and] they may tend to prove what Doe Corp. knew and when they knew it." *Id.* The interview documents, the Court noted, might be the only available source of information on these points. Finally, mindful of the potential for disclosure of lawyers' mental processes in these documents, the Court noted that the greater protection typ-

---

**9.** This discussion pertains to the 89–3 subpoena directed to documents exclusively in Movant's possession. To the extent that documents reflecting the interviews are also in the Subsidiary's custody, the Court has already noted, *supra,* that the Subsidiary's waiver of the privileges is effective and cannot be blocked by the Movant. The Court has also noted that to the extent such documents fall into Group I, Movant has waived its privilege by not taking steps to insure that the Subsidiary relinquished its copies after Movant's sale of its controlling interest in Subsidiary. Thus, interview documents called for in the 89–4 subpoena must be produced by the Subsidiary. The discussion here, therefore, is limited to those interview documents called for in the 89–3 subpoena and in Movant's exclusive custody.

ically afforded such processes warranted an *in camera* inspection of the interview documents prior to disclosure.

Similar circumstances in the case at bar warrant the same result. The interviews in issue here were conducted approximately two years ago and concerned events occurring as much as six years ago. These interviews would surely constitute the most accurate and the principal, if not sole, source of evidence of Movant's state of knowledge in 1984 and thereafter. Surely the passage of six years has faded, if not wholly erased, most memories. Several critical Movant employees are targets of the investigation and, like some of the witnesses in *John Doe Corp.*, they have chosen to invoke the Fifth Amendment right to remain silent. There is here, as there was in *John Doe Corp.*, a sufficiently strong showing of need to overcome the work product privilege as to documents reflecting "what employee A and B said." As in *John Doe Corp.*, however, the Court will conduct an *in camera* inspection of these interview documents prior to ordering disclosure. As a result of this inspection, the Court may order appropriate redactions to protect against any unwarranted or unnecessary disclosure of attorneys' mental processes.

## V. *Crime–Fraud Exception*

█ It is generally and widely settled, that when an attorney "is consulted not with respect to past wrongdoings but rather to further a continuing or contemplated criminal or fraudulent scheme," the attorney-client privilege is extinguished. *In re Grand Jury Subpoenas Duces Tecum*, 773 F.2d 204, 206 (8th Cir.1985) (citations omitted). *See generally* Morvillo, *Crime Fraud Exception*, 199 N.Y.L.J. 1 (1988). This principle applies with equal force to claims of work product privilege. *See, e.g., In re International Systems & Controls Corp. Securities Litigation*, 693 F.2d 1235, 1242–43 (5th Cir.1982); *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982). But the privileges are not easily overcome. To succeed, the government must make a *prima facie* showing that the lawyer was consulted and employed for the purpose of facilitating or

concealing an ongoing, or future, criminal or fraudulent scheme. *See, e.g., In re Grand Jury Subpoena*, 884 F.2d 124, 125 (4th Cir.1989). This burden, however, does not require showing the attorney's knowledge of the criminal or fraudulent scheme; the crime fraud exception applies without regard to the attorney's knowledge. *See, e.g., In re Grand Jury Proceedings*, 680 F.2d 1026, 1028 (5th Cir.1982); *In re Sealed Case*, 676 F.2d 793, 812 (D.C.Cir. 1982). The exception's rationale is rooted in the notion that the law should not permit those engaged in criminal conduct to retain lawyers and use the attorney-client privilege as a sword to advance their illegal aims.

█ The Court is not persuaded that the government in this case has made the requisite *prima facie* showing for the operation of the crime-fraud exception. The record shows only that in-house counsel was directed to conduct an internal investigation, including interviews, at or about the time that management may have learned of the alleged theft of the computer code. In no way do these facts establish a *prima facie* case that the attorney was retained for the purpose of facilitating or concealing a criminal or fraudulent scheme. Rather, the facts adduced by the government are entirely consistent with an innocent and prudent decision by management, faced with allegations of corporate illegality, to have its lawyers conduct an internal investigation. To conclude otherwise on this record would condemn and discourage essentially every internal corporate investigation. That is not the intention of the crime-fraud exception.