UNITED STATES of America ex rel.
Jerry J. MAYMAN, Plaintiff

v.

MARTIN MARIETTA CORPORATION,
Defendant.

Civ. A. No. MJG 91–1853.

United States District Court,
D. Maryland.

May 16, 1995.

Roann Nichols, and U.S. Atty., Baltimore, MD, Dodge Wells, and Dept. of Justice, Washington, DC, for plaintiff the U.S.

Robert L. Vogel, Esquire, Washington, DC, for plaintiff Jerry J. Mayman.

Michael Schatzow, Elizabeth M. Borinsky, Venable, Baetjer and Howard, Baltimore, MD, Thomas J. Madden, James F. Worrall, Venable, Baetjer and Howard, Washington, DC, and Francis B. Burch, Jr., and Robert J. Mathias, Piper & Marbury, Baltimore, MD, for defendant.

GARBIS, District Judge.

The parties seek the Court's ruling as to the availability of the attorney-client privilege for certain documents written by in-house counsel for Defendant Martin Marietta Corporation ("Defendant" or "Martin Marietta"). Defendant filed a Brief to the Court Regarding the Attorney–Client Privilege which the Court and the parties have treated as an informal Motion for Protective Order. The Court has reviewed the materials filed by the parties and had the benefit of the arguments of counsel.

Plaintiffs seek access to facially privilege documents, claiming that the attorney-client privilege is unavailable on the grounds that:

1. Defendant waived the privilege by inadequately preserving confidentiality, as evidenced by the possession by a former employee of a partial draft of an otherwise privileged document.

2. The crime-fraud exception applies.

3. Defendant waived the privilege by a disclosure made in a letter its attorney sent to opposing counsel in the course of settlement negotiations.

For the reasons set forth herein, the Court concludes that the Plaintiffs' first two grounds are meritless but that, in light of Fourth Circuit precedent, Plaintiffs must prevail on their third ground.

## I. LEGAL STANDARD

██ Martin Marietta carries the burden to prove both the applicability of the attorney-client privilege to the documents and the absence of waiver by Defendant. *See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982). The privilege is "not favored by federal courts" and will be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir.1984) (quotations omitted).

As noted at the hearing, this Court, for the purposes of this ruling, sits as a finder of both fact and law. Therefore, the Court can find facts based upon the evidence presented and the inferences therefrom.

## II. BACKGROUND

In 1984, the United States Navy contracted with the Defendant for the design and construction of a full-scale model of a "fake" missile, called a Supersonic Low Altitude Target ("SLAT"), for use in testing missile defense systems. Martin Marietta agreed to design and build the SLAT prototype for $103.6 million. Plaintiffs claim that Martin Marietta planned to obtain far in excess of $103.6 million for its work on SLAT but deliberately underbid in order to win the contract. Then, according to Plaintiffs, once Martin Marietta had the contract, the company fraudulently recovered an additional $30.3 million by treating some of the SLAT work as "independent research."

Under agreements with the Government, defense contractors are paid to conduct independent research, called Independent Research and Development ("IR & D" or "IRAD"), which may prove beneficial to future contracts. However, contractors are not allowed to use IR & D funds to pay for work they are obligated to do as part of existing contracts. Thus, Plaintiffs claim that Martin Marietta's alleged plan to bill work required by SLAT as if it were IR & D was a fraudulent scheme.

Martin Marietta claims that, as it understood the rules at the time, it could bill as IR & D any work which, in addition to benefitting the SLAT contract, also benefitted other

actual or potential contracts. Defendant claims that the $30.3 million it billed to IR & D met this definition and was therefore properly charged.

On July 2, 1991, the instant law suit was filed by an ex-employee of Martin Marietta, Jerry J. Mayman, pursuant to the False Claims Act, 31 U.S.C.A. § 3729 *et seq.* (West 1983 & Supp.1994). This statute allows individuals with "direct and independent" knowledge of false claims to the Government to file so-called *qui tam* complaints on their own behalf and on behalf of the federal Government. The statute provides for considerable financial rewards for *qui tam* plaintiffs if a false claim is subsequently found. *Id.* § 3730(d). The Government has the option to intervene in and manage the case. *Id.* § 3730(c).

In this case, the Government engaged in a criminal investigation of pertinent allegations and, ultimately, decided to intervene in the instant lawsuit.

### III. *THE DEVORE DOCUMENT ACQUISITION*

For present purposes, Roger DeVore's story [1] can be told briefly. He was employed by Defendant in 1979. In or about July of 1990, he became manager of New Business Acquisition Expenditures Finance. In early 1992, he was moving to a new, smaller office. In preparation, he went through all of his office files and found several confidential documents. These included a partial (four of five pages) copy of a draft (dated December 15, 1986) of a Memorandum from Richard C. Bruning, General Counsel for the Martin Marietta Corporation (MMC) Electronics and Missiles Group in Orlando, Florida, to A. Thomas Young, President of the MMC Electronics and Missiles Group ("the Partial Draft") regarding matters relevant to the instant case. DeVore kept the documents for personal purposes and, upon the termination of his employment, took a copy of the Partial Draft with him.

The Partial Draft became known to Plaintiffs in September of 1994 when DeVore contacted a Government investigator and counsel for Plaintiff Mayman seeking to obtain some compensation for turning over the document. Thereafter, Counsel for Plaintiffs notified counsel for Defendant so that appropriate issues could be resolved by the Court.[2]

Plaintiffs claim that Defendant waived the attorney-client privilege as to the Partial Draft when it allowed DeVore's predecessor (or whomever else it was that placed the document in DeVore's office) to receive the Partial Draft. Plaintiffs alternatively claim that the Defendant failed to take reasonable precautions to prevent DeVore from taking the Partial Draft with him when he left the Defendant's employ. (Gov't Mem. at 20.)

█ The Court finds, on the evidence, that whoever placed the Partial Draft in DeVore's office had obtained it without authority to do so. Putting aside the matter of DeVore's credibility, the Court will assume (without deciding) that another person ("Mr. X") placed the Partial Draft in the office. Nevertheless, the evidence establishes that Mr. X was not an authorized recipient. Mr. X had only a draft, not the final document. It is highly unlikely that a person authorized to receive and keep a copy of a draft would not also receive and keep a copy of the final version of the document. Second, the Partial Draft did not contain the second of five pages. An authorized recipient, upon receiving a copy with a missing page, would have requested, obtained and saved a complete copy. Any person who wanted to save a copy of the draft would have wanted, and would have obtained if possible, the missing page.

DeVore claims no knowledge as to how the confidential documents he found got into his

---

1. The Court, as fact finder, treats DeVore's testimony with great skepticism as it relates to his acquisition of Defendant's confidential documents. However, inasmuch as DeVore's actions may be pertinent to his personal, employment discrimination claim against the Defendant, the Court will leave the ultimate determination of his credibility to the fact finder in that case.

2. The Court is not addressing, and hence in no way resolving, any contentions regarding the propriety of actions taken by Plaintiffs' counsel or investigators in regard to the Partial Draft.

office. He speculates that the document was obtained by his predecessor in the office. In any event, he proceeded to keep these documents, including the Partial Draft, as a personal secret cache for possible future use against his employer. He not only failed to advise anyone of what he had found, he hid the fact. In August of 1991, DeVore was one of Defendant's employees who oversaw the response to a subpoena related to the Government's investigation of SLAT billing. The subpoena would have required the production (or inclusion on a list of privileged documents) of the Partial Draft. DeVore did not reveal his possession of the Partial Draft to the Defendant's representatives. Thus, it was not included on the "privileged list." [3]

When DeVore's employment was terminated by the Defendant, he decided to take a copy of the Partial Draft with him. So, he says, he made another copy [4] and simply took it for his future use. DeVore affirmatively lied about his possession of the Partial Draft when he signed his Employee Termination Statement certifying that "I have returned all property of Martin Marietta Corporation ... that I have had in my possession."

The Court finds that, regardless of the identity of Mr. X, when DeVore obtained the Partial Draft he converted it to his personal use. And, the Court finds that DeVore stole the copy of the Partial Draft that he removed from the Defendant's premises while making the false statement that he had returned all of the Defendant's property in his possession.

Finally, the Court finds that the Defendant did not fail to take reasonable precautions to preserve the confidentially of a privileged document. The document in issue was maintained in a secure building and all who had authorized access to it were under a legal obligation to maintain it as confidential. The only way that confidentiality was breached was due to the unauthorized action of a trusted employee (DeVore or Mr. X) in obtaining a copy of part of a document and the outright theft of a copy by Mr. DeVore. On the

evidence before the Court, it cannot conclude that the Defendant failed to take any reasonable precaution that would have prevented Mr. DeVore's theft. The privilege was not waived. *See In re Grand Jury Proceedings,* 727 F.2d at 1356.

## IV. *CRIME–FRAUD EXCEPTION*

Plaintiffs claim that the crime-fraud exception bars Defendant's assertion of the attorney-client privilege with respect to the legal advice General Counsel Bruning provided to his superiors about the relationship between IR & D and SLAT charges. Plaintiffs contend that the Defendant sought the subject legal advice from Bruning in furtherance of an ongoing fraud and/or crime. Plaintiffs ask the Court to conduct an *in camera* review of the Partial Draft stolen by DeVore to determine whether it provides evidence which would support the existence of the crime-fraud exception. Although Plaintiffs talk about the crime-fraud exception in the context of the Partial Draft, the Court assumes that Plaintiffs ultimately want access to the final version of that memorandum dated January 20, 1987.[5]

■ The Supreme Court has held that a court can examine an otherwise privileged document to determine if the crime-fraud exception applies to that document. *United States v. Zolin,* 491 U.S. 554, 564–70, 109 S.Ct. 2619, 2627–29, 105 L.Ed.2d 469 (1989). However, the Court cannot examine an otherwise privileged document *in camera* absent an adequate threshold showing. *Id.* at 572–73, 109 S.Ct. at 2631. As stated in *Zolin,* "The threshold we set ... need not be a stringent one." *Id.* The *Zolin* Court said:

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person," *Caldwell v. District Court,* 644 P.2d 26, 33 (Colo.1982), that *in camera*

---

**3.** As noted *infra,* the final version of the Partial Draft was included on the "privileged list."

**4.** DeVore claims he left the Partial Draft in his office when he left and removed a copy he had made. For present purposes, it is immaterial

whether DeVore took the copy he had or made a new copy.

**5.** The memorandum by Bruning is hereinafter referred to as the "Bruning Memorandum."

review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

However, even this minimal standard does require *something* other than a bare claim by a party seeking to negate the privilege. To make the threshold showing, Plaintiff must present some nonprivileged evidence. As stated in *Zolin*, "[t]he threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged." *Id.* 491 U.S. at 574–75, 109 S.Ct. at 2632. The Court can consider evidence which would be inadmissible at trial. *In re Grand Jury Subpoena,* 884 F.2d 124, 127 (4th Cir.1989). However, the Plaintiffs may not use privileged information. *See Cunningham v. Connecticut Mutual Life Ins.,* 845 F.Supp. 1403, 1413 (S.D.Cal.1994) (noting that, under *Zolin,* "only nonprivileged relevant evidence lawfully obtained is used to determine whether to conduct an *in camera* review").

On the facts of the case at bar, the Partial Draft cannot be used to make the Plaintiffs' threshold showing. Nor can Plaintiffs present secondary evidence of the Partial Draft's contents obtained because the thief, DeVore, told one of their attorneys or investigators what the document contained. The secondary evidence of the contents of the Partial Draft, like the Partial Draft itself, was not properly obtained.

■ Under the circumstances here presented the Court cannot examine the otherwise privileged Partial Draft to determine whether the crime-fraud exception is applicable. Without the Partial Draft, the record is devoid of any showing adequate to permit the Court to examine any other documents facially subject to the attorney-client privilege.[6] The Court must conclude that the crime-fraud exception is not applicable.

## V. *THE SETTLEMENT NEGOTIATIONS DISCLOSURE*

### A. *Background*

The Government and Martin Marietta engaged in discussions regarding the possible settlement of the Government's claims arising out of the IR & D/SLAT contract dispute here at issue. On March 29, 1994, the Government offered to settle the case for $18,-470,000. In response, an Associate General Counsel for Defendant wrote a letter of April 8, 1994, to Government counsel. ("The April Letter"). In this letter, Defendant stated "the reasons why Martin Marietta cannot accept your settlement offer and why it believes continued discussion is necessary."

In the April Letter, Martin Marietta denied that it had intentionally violated the law or committed a fraud. Martin Marietta claimed that the regulations, as interpreted by a 1969 decision of the Armed Services Board of Contract Appeals, *North American Rockwell,* ASBCA NO. 13067, 1969 WL 544, 169 ASBCA LEXIS 129, 69–2 BCA (CCH) ¶ 7812 (July 22, 1969), permitted the corporation to bill the way it did. The company said that it had "interpreted this case, and continues to do so today" as permitting the billing procedure used. (April Letter at 6.) According to the April Letter, Martin Marietta formed its legal opinion based on the "contemporaneous" advice of in-house counsel, stating:

> This interpretation of the *North American Rockwell* case and the governing DAR [Defense Acquisition Regulations] provisions was set forth in a contemporaneous memorandum regarding IRAD use on the SLAT contract. (*See* document Nos. 1653692–93). Contemporaneous memoranda also establish that Martin Marietta's legal department accepted this interpretation of the proper use of IRAD (*See* Document Nos. 1653686–87).

*Id.* at 7. Defendant further stated that, "Martin Marietta continues to believe that its interpretation of applicable case law and regulations is reasonable." *Id.* at 8.

The first "contemporaneous memorandum" referred to in the April Letter was a November 29, 1984, "Intracompany Memorandum" which assessed the ability of Martin Marietta to charge certain SLAT tasks to IR & D. This Memorandum was authored by J.R.

---

6. For example, the final Bruning Memorandum.

Clark, a nonlawyer. Clark concluded that Martin Marietta could charge certain SLAT-related tasks, called Navy Missile Systems (NMS) tasks, to IR & D, stating:

> While it would be obvious to many people who are knowledgeable of the SLAT contract that these Navy Missile tasks are of benefit to that contract, documentation I have examined is clearly also applicable to other advanced programs, such as ASAW, OABM, AASM and High Altitude Navy targets.... [Based on *North American Rockwell*], it is my opinion that the Navy Missile System tasks, if challenged by elements of [the Department of Defense] can be defended as IRAD....

(Clark Mem. at 1 (Def.Resp., Ex A.)) [7]

The second such document was a January 16, 1985, "Intracompany Memorandum" entitled "Application of IRAD Technology for Air Launched Missile Systems." Chris Gigicos, another nonlawyer, outlined "the procedure which will be used to contract for developing technology under IRAD ... so that the technology can be applied to future air launched missile and target systems." (Gigicos Mem. at 1 (Def.Resp., Ex. B.)) Gigicos stated that in addition to taking advantage of completed IR & D work,

> it may be possible to draw upon ongoing IRAD developments to fulfill specific requirements in various prime contracts rather than undertake duplicative efforts. This can be accomplished in those instances where the IRAD efforts have proceeded sufficiently to provide designs, drawings, concepts, specifications, etc. which are directly applicable or applicable with modifications to solicitations for which the technology may be applied.

*Id.* On the second page, Gigicos set forth proposed guidelines for "IRAD procurements" relating to existing or expected contracts. *Id.* at 2. At the bottom of the second page, Michael E. Gillett, an attorney, signed under "Concurrence" for "Legal" *Id.* at 2.[8]

In-house counsel also authored additional memoranda as to the relationship between IR & D and SLAT contemporaneous with Defendant's making of claims at issue. In response to a subpoena, Martin Marietta claimed that these additional memoranda were protected by the attorney-client privilege. On a list of "Corporate Documents Withheld [from Production]," Martin Marietta included seven documents. (Gov't Mem., Ex. 2.) One was the Bruning Memorandum, at issue *supra.* Another was a December 11, 1985, memorandum by William J. Iseman, Assistant General Counsel for the EMG, to Bruning entitled "re: Legal Advice re: SLAT IRAD." [9]

Plaintiffs argue that Martin Marietta waived its attorney-client privilege as to the Bruning and Iseman Memoranda when it sent the Government the April Letter disclosing otherwise confidential legal advice on the same subject matter.

### B. *Effect Of Disclosure In Settlement Negotiations*

The initial question presented is whether a disclosure of otherwise privileged communication during the course of settlement negotiations can waive the attorney-client privilege.

Subject to certain exceptions [10] not here relevant, a voluntary disclosure of privileged

---

7. Clark expressed fear that employees might not realize the broader applicability of their SLAT work and might misinform government investigators engaging in "witch hunts." (Clark Mem. at 1.) He said:

> To safeguard against such occurrence, I believe it is necessary that all personnel utilized in the Navy Missile Systems IRAD tasks be "read-in" to the overall strategy we currently have and that the intent of the division and the corporation is to utilize the data developed for other applications. The fact that it is of benefit to the SLAT contract is no different than using data from other IRAD programs and other contracts both past and present.

*Id.* at 2.

8. The concurrence by Gillett is hereinafter referred to as the "Gillett Concurrence."

9. The memorandum by Iseman is hereinafter referred to as the "Iseman Memorandum."

10. For example, there is an exception for information conveyed to a third party for the purpose of facilitating legal advice. Thus, an attorney can use the services of a legal assistant or accountant in the rendering of legal services without waiving the privilege. *United States v. Kovel*, 296 F.2d 918. 921–22 (2nd Cir.1961). Also,

information to any third party waives the attorney-client privilege. *United States v. (Under Seal)*, 748 F.2d 871, 874–75 (4th Cir. 1984); *Jones*, 696 F.2d at 1072 ("Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the attorney-client privilege.")

However, courts also strongly encourage open and frank discussion in negotiations as a means to enhance settlement possibilities. *See, e.g., Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 45 (D.Md.1974) ("Any question of waiver of the attorney-client privilege or work product immunity during settlement negotiations must be considered in light of the importance of facilitating such settlement.")[11] Thus, the Federal Rules of Evidence generally prevent a party from using at trial statements made during, or information specifically prepared for the purposes of, settlement discussions. Fed.R.Evid. 408 (West 1984).

In many jurisdictions, the issue here presented would be of first impression. However, the Fourth Circuit addressed the matter in a case, coincidentally, involving Defendant Martin Marietta. *In re Martin Marietta Corp.*, 856 F.2d 619, 624 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989). In that case, the Government had investigated a subsidiary of Martin Marietta for improper overbilling. *Id.* at 620. In an effort to stave off criminal prosecution, Martin Marietta had provided the Government with a position paper which included the results of an internal investigation and audit. The position paper indicated that only one of its employees, William J. Pollard, knew of the overbilling scheme. *Id.* at 623. The Government and Martin Marietta settled the matter as between them. However, the Government indicted Pollard. To facilitate his defense Pollard sought copies of the full internal investigation and audit,

any supporting papers, and any communications between Martin Marietta and the Government during the course of the settlement process. *Id.* at 620–21. Martin Marietta claimed that these materials were privileged. *Id.* at 620.

The Fourth Circuit granted each of Pollard's requests. The court recognized the countervailing policy concerns "such as facilitating the settlement of litigation, permitting full cooperation among joint defendants, expediting discovery and encouraging voluntary disclosure to regulatory agencies." *Id.* at 623. Nevertheless, the court stated that "[t]here can be no dispute but that otherwise privileged materials were disclosed to the United States Attorney and the DOD [Department of Defense]. The issue is the extent of the implied waiver thereby created." *Id.* at 622. The court refused to limit the waiver to the party to whom the privileged material was disclosed. *Id.* at 623. Instead, a disclosure to any party could waive the privilege as to all parties.[12] Therefore, the Fourth Circuit in *In re Martin Marietta* held that the revelation of otherwise confidential information during a settlement conference is a disclosure that can waive the attorney-client privilege. *See* Breckinridge L. Willcox, *Martin Marietta and the Erosion of the Attorney–Client Privilege and Work–Product Protection*, 49 Md.L.Rev. 917, 917 (1990) ("The decision greatly expands the doctrine of implied waivers and applies it to a new context—the settlement conference."); Note, Margaret A. Carfagno, *Settlement Situations and the Maintenance of Confidentiality: A Look at the Martin Marietta Decision*, 1990 Colum.Bus.L.Rev. 187, 187 (1990) (describing the case as the "latest of a series of cases holding the attorney-client privilege and the work product doctrine are waived when a corporation discloses otherwise privileged in-

---

under certain circumstances a party may disclose confidential information to those who have a commonality of interest, e.g. co-defendants, without a privilege waiver. *See United States v. (Under Seal)*, 748 F.2d 871, 874 (4th Cir.1984)

**11.** The district court found that a waiver had occurred by disclosure during the settlement negotiations but limited its scope to the information actually revealed during the negotiations. *Bur-*

*lington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 46 (D.Md.1974).

**12.** A waiver limited to the party to whom the disclosure was made would not help Martin Marietta in the current case since the disclosure was made to the Government, and it is the Government that seeks use of the information now.

formation to a governmental agency or department").

■ Martin Marietta attempts to distinguish *In re Martin Marietta* from the case at Bar. First, Martin Marietta suggests that the internal investigation and audit in *In re Martin Marietta* "lost their confidential status because they induced an adverse party to settle." (Def.Resp. at 14.) Here, the Government did not rely upon the disclosures to settle the case. However, Martin Marietta offers no support for the suggestion that the existence of a disclosure depends on the reaction of the third party to the disclosure. The case law indicates that a disclosure occurs when a party voluntarily breaches the confidentiality of its communication with counsel. That confidentiality is breached whether or not the recipient relies upon on the disclosed information.

Second, Martin Marietta argues that in *In re Martin Marietta* the company provided an express assurance of the completeness of its position paper (*id.*) whereas, in this case, Martin Marietta made no such promise. Martin Marietta provides no support for this contention. The *existence of a disclosure* does not depend on the promises surrounding the completeness of the disclosure. The *scope of a disclosure* may, in some circumstances, be affected by promises regarding completeness.

Third, Martin Marietta claims that "basic fairness" mandated that Pollard have access to the full internal investigation of which he was charged with obstructing. *Id.* at 15. This is perhaps, a motivation for the holding in *In re Martin Marietta.* It was, however, not the court's stated reason. Nor does it appear that a general concept of "basic fairness" is pertinent to the issues here presented.

■ Fourth, Martin Marietta argues that the position paper at issue in *In re Martin Marietta* "quoted" specific privileged communications (*Id.* at 14); whereas, the April Letter "did not identify nor quote any attorney-client communication" or the Bruning Memorandum (*id.* at 15). Martin Marietta is factually wrong. The April Letter did identify and attach the Gigicos Memorandum which

included the Gillett Concurrence. In any event, a party need not quote from a particular communication in order to waive privilege with respect to it. A summary, paraphrase or clear reference to the substance of a communication can waive the confidentiality of that communication. *See In re Grand Jury Proceedings,* 727 F.2d at 1356 ("Nor is the loss of the privilege confined to 'the particular words used to express the communication's content' but extends 'to the substance of a communication,' since the disclosure of ' "any significant part" of a communication waives the privilege' ...").

Finally, Martin Marietta suggests that the material sought in *In re Martin Marietta* was of an "entirely different character" from what the Government seeks here. (Def.Resp. at 15.) Martin Marietta claims that, in *In re Martin Marietta,* the internal investigation and audit were conducted with the intention to reveal its contents; whereas, Bruning never intended his advice "to lose its confidential character." *Id.* at 15–16.

Martin Marietta misses the point. Waiver by its very nature destroys the privilege for what was originally confidential information. If, in *In re Martin Marietta,* the company had conducted the internal investigation and audit with the intent to publish the results, the investigation and audit were never privileged in the first place. The Fourth Circuit did not base its decision on any initial lack of confidentiality but instead found that Martin Marietta had waived its privilege to otherwise confidential communications through disclosure during the settlement process. In the case at bar, the Court assumes that Defendant intended that Bruning's legal advice be confidential. The question is whether the subsequent disclosure by the client waived the privilege protecting that advice.

Martin Marietta's exclusive focus on the investigation and audit in *In re Martin Marietta* ignores the fact that the Fourth Circuit treated the company's written communications to the Government made during settlement as a waiver. These written communications closely parallel the April Letter in the instant case.

In sum, the holding in *In re Martin Marietta* did not depend on the nature or impor-

tance of the company's position paper, the Government's reliance on it, or the company's express assurance of completeness about it. A disclosure took place when the company, through its attorneys, revealed otherwise confidential information to an adverse party. The Fourth Circuit, *In re Martin Marietta,* refused to nullify, or limit, the waiver because it was made in the context of settlement negotiations.

## C. *Scope Of Waiver, In General*

Having found that there was a waiver, the issue presented is the extent to which Martin Marietta waived its privilege. In *In re Martin Marietta,* the Fourth Circuit rejected the contention that a waiver by disclosure is limited to only the material actually revealed. *In re Martin Marietta,* 856 F.2d at 623. However, the court referred to the scope of waiver in two different ways.

First, the Fourth Circuit said that a "subject matter waiver has been worked as to the attorney-client privilege" and defined a "subject matter waiver" as "all information related to the same subject matter." *Id.*

But, second, the court stated:

[The Fourth Circuit] has held that if a client communicates information to his attorney with the understanding that the information will be revealed to others, that information as well as " 'the details underlying the data which was to be published' " will not enjoy the privilege.

*Id.* (citations omitted). The court defined "[t]he details underlying the published data" as

the communications relating the data, the document, if any, to be published containing the data, all preliminary drafts of the document, and any attorney's notes containing material necessary to the preparation of the document [and c]opies of other documents, the contents of which were

necessary to the preparation of the published document

*(Under Seal),* 748 F.2d at 875 n. 7.

In *In re Martin Marietta,* the Fourth Circuit did not expressly state which of the two standards it relied upon in granting Pollard access to the documents. The court could have granted his request under either standard. As the court noted, "all the materials at issue in the present case are either information revealed to others or details underlying the data that was published." *In re Martin Marietta,* 856 F.2d at 624. Therefore, the Fourth Circuit could have reached the same conclusion without holding that there was a subject matter waiver.[13] But, the Fourth Circuit did not so limit its holding.

The two district courts in the Fourth Circuit that have considered the issue have interpreted *In re Martin Marietta* as mandating a broad subject matter waiver. Judge Ellis of the Eastern District of Virginia stated:

This circuit adheres to a full subject-matter waiver rule as to the attorney-client and non-opinion work product privileges. Disclosure of a privileged communication waives the privilege as "to all information related to the same subject matter."

*In re Grand Jury Subpoenas,* 734 F.Supp. 1207, 1213 (E.D.Va.) (quoting *In re Martin Marietta* ), *aff'd in pt. & rev'd in pt. on other grounds,* 902 F.2d 244 (4th Cir.1990); see also the discussion in *Vaughan Furniture Co. v. Featureline Mfg.,* 156 F.R.D. 123, 128 (M.D.N.C.1994). In *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 484–85 (S.D.N.Y.1993), Magistrate Judge Dolinger described *In re Martin Marietta* as embracing a "broader concept of 'subject matter' waiver based on prior disclosure," stating:

This notion that disclosure of privileged communications either in the course of liti-

---

**13.** In *United States v. Jones,* 696 F.2d 1069 (4th Cir.1982), the Fourth Circuit used broad language but applied a narrower standard. The court stated that:

Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but of-

ten as to all communications related to the same subject matter.

*Id.* However, the court in *Jones* then held that the defendant could not "prevent revelation of the factual communications between the appellant and their attorneys *underlying the published opinion letters." Id.* at 1073 (emphasis added).

gation or in other contexts will open the door to exploration of all otherwise protected communications that deal with the same "matters" appears to be generally accepted in most other jurisdictions. *Id.* at 484.

■■■ This Court concludes, as did the courts in *In re Grand Jury Subpoenas* and *Vaughan Furniture Co.*, that a full subject matter waiver is in keeping with the explicit language and underlying concerns of the Fourth Circuit in *In re Martin Marietta* and other cases. The Court must conclude that the Fourth Circuit meant what it said when it called for a "subject matter waiver." Moreover, in *United States v. Jones*, the Fourth Circuit said, "Selective disclosure for tactical purposes waives the privilege." *Jones*, 696 F.2d at 1072 (citing *In re Sealed Case*, 676 F.2d 793 (D.C.Cir.1982)). Selective disclosure occurs not only when a party reveals part of one privileged communication, but also when a party reveals one beneficial communication but fails to reveal another, less helpful, communication on the same matter.

In sum, Martin Marietta has waived its privilege as to communications on the same subject matter as the confidential matters disclosed by the April Letter.

### D. *The Waiver In The April Letter*

For reasons stated above, the Court has concluded that Defendant has waived the attorney-client privilege as to other communications on the same subject as the pertinent part of the April Letter. It is now necessary to determine what was that subject matter.

The April Letter stated, "Contemporaneous memoranda also establish that Martin Marietta's legal department accepted this interpretation of the proper use of IRAD. (*See* Document Nos. 1653686–87) [containing the Gillett Concurrence]." (April Letter at 7.) The use of the plural "memoranda" meant that the Gillett Concurrence was but one example of supportive in-house counsel communication.[14] Moreover, the April Letter's broad language communicated to a reasonable reader that *all* "contemporaneous" in-house legal advice supported the legality of Martin Marietta's division of claims for SLAT-related work between SLAT and IR & D.

■ The Court reads the April Letter's use of the term "contemporaneous" to mean all advice of counsel given while the company was claiming SLAT-related work as IR & D, i.e. all billings through 1987. This reading flows from Martin Marietta's purpose in making the April disclosure. The company asserted to the Government that it had not knowingly violated the law when it made certain charges to IR & D. A knowing violation would have occurred if, at any time, Martin Marietta submitted claims knowing that they violated the law. Martin Marietta's legal interpretation of the case law and regulations had to remain uncontradicted by in-house counsel during the entire period of time in which it billed SLAT-related work as IR & D in order for the assertion of supportive "contemporaneous" legal advice to be meaningful in context.

Here, the subject matter of the disclosure is in-house legal advice on use of IR & D to perform work required by existing contracts during the period Martin Marietta was using IR & D to support SLAT. The Bruning and Iseman Memoranda[15] fall within this subject

---

**14.** The Government disputes the relevance of the Gillett Concurrence because it does not directly address the use of IR & D to support SLAT. In support of its position, the Government submitted a copy of a memorandum Gillett wrote to Gigicos. (Gov't Reply, Att. 1.) The Gillett Memorandum is dated January 21, 1985, five days after the Gigicos Memorandum. The Gillett Memorandum is included on a list of privileged documents, entitled "Orlando Documents Withheld." (Gov't Mem., Ex. 2.) The Government did not explain how it received this document. However, Martin Marietta has not raised any objections to its use. In any event, the Court's decision is not based on any disclosure in the Gillett Concurrence *per se*. The April Letter (including its references) is the disclosure which waived the privilege.

**15.** The record does not permit the conclusion that the waiver extended to drafts, rather than final documents. Accordingly, the privilege was not waived as to the draft of the Bruning memorandum or the Partial Draft stolen by DeVore. The drafts were not legal advice provided to Defendant; only the final versions were.

matter. Martin Marietta waived the attorney-client privilege as to these documents by the April Letter.

It should finally be noted that the Court would hold that Martin Marietta waived its privilege to the Bruning and Iseman Memoranda even under a narrower standard limiting the waiver to "details underlying" the disclosed communication. In order for counsel to have made the above quoted general statement in the April Letter, he had to have read and considered all contemporaneous, in-house counsel advice on the use of IR & D for SLAT-related work. Therefore, he had to have read and considered the Bruning and Iseman Memoranda. Accordingly, these two Memoranda were "documents, the contents of which were necessary to the preparation of the published document." *(Under Seal)*, 748 F.2d at 875 n. 7.

## IV. *CONCLUSION*

For the foregoing reasons:

1. Defendant's Motion for Protective Order is **DENIED.**

2. Within seven days of the date of this Order, Defendant shall provide to Plaintiffs copies of:

 a. The January 20, 1987, Bruning Memorandum.

 b. The December 11, 1985, Iseman Memorandum.